[No. C009444. Third Dist. Apr. 30, 1992.]

*CALIFORNIA TEACHERS ASSOCIATION et al., Plaintiffs and Respondents, v.
THOMAS W. HAYES, as Director of the Department of Finance, etc., Defendant and Respondent,
BILL HONIG, as Superintendent of Public Instruction, etc., Defendant and Appellant;
CALIFORNIA CHILDREN'S LOBBY et al., Real Parties in Interest and Appellants.

*Reporter's Note: This case was previously entitled "California Teachers Association v. Huff."

COUNSEL

Joseph R. Symkowick, Roger D. Wolfertz and Allan H. Keown for Defendant and Appellant.

James R. Wheaton, Gray, Cary, Ames & Frye and Paul J. Dostart as Amici Curiae on behalf of Defendant and Appellant.

Robert C. Fellmeth, Carl K. Oshiro and Terry A. Coble for Real Parties in Interest and Appellants.

Barbara C. Carlson, Abby J. Cohen and Carol S. Stevensen as Amici Curiae on behalf of Real Parties in Interest and Appellants.

Remcho, Johansen & Purcell, Joseph Remcho, Barbara A. Brenner and Julie M. Randolph for Plaintiffs and Respondents.

Kronick, Moskovitz, Tiedemann & Girard and Rochelle B. Schermer as Amici Curiae on behalf of Plaintiffs and Respondents.

Daniel E. Lungren, Attorney General, N. Eugene Hill, Assistant Attorney General, Cathy Christian and Marsha A. Bedwell, Deputy Attorneys General, for Defendant and Respondent.

OPINION

**SPARKS, Acting P. J.**—At the November 1988 General Election, the electorate adopted Proposition 98, an initiative measure entitled "The Classroom Instructional Improvement and Accountability Act"[1] In general, Proposition 98 seeks to improve public education in California by establishing a minimum funding guarantee for public schools and by changing the way our state government treats its excess revenues. As the Legislative Analyst noted in her analysis of the initiative, Proposition 98 establishes a minimum level of funding for public schools and community colleges; requires the state to spend any excess revenues, up to a specified maximum, for public schools and community colleges; requires the Legislature to establish a state reserve fund; and requires the school districts to prepare and distribute "School

---

[1]Proposition 98 (Stats. 1988, p. A-264 et seq.) added two sections to the California Constitution, amended two other constitutional provisions and added six sections to the Education Code. It added section 5.5 to article XIII B of the California Constitution, amended section 2 of article XIII B, amended section 8 of article XVI, added section 8.5 to article XVI, and added sections 33126, 35256, 41300.1, 14020.1, 14022 and 41302.5 to the Education Code.

The full text of Proposition 98 is set out in the appendix to this opinion.

Accountability Report Cards" each year. (Ballot Pamp. analysis of Prop. 98 by Legislative Analyst as presented to the voters, Gen. Elec. (Nov. 8, 1988), p. 78, some capitalization and all paragraphing omitted.)

To these ends, Proposition 98 sets a minimum funding level for "the monies to be applied by the state for the support of school districts and community college districts. . . ." (Cal. Const., art. XVI, § 8, subd. (b).) It is around this phrase that the present controversy swirls. At issue in this case is the validity of the Legislature's decision to include funding for the Child Care and Development Services Act (Ed. Code, § 8200 et seq.) within the educational funding guarantees of Proposition 98. This decision was implemented by the enactment of Education Code section 41202, subdivision (f), which declares that " 'monies to be applied by the state for the support of school districts and community college districts,' as used in Section 8 of Article XVI of the California Constitution, shall include funds appropriated for the Child Care and Development Services Act . . . ."

The California Teachers Association and three of its officers filed a petition for writ of mandate against the Director of Finance, the state Treasurer and the state Superintendent of Public Instruction to prohibit the inclusion of funding for the Child Care and Development Services Act within the Proposition 98 education funding guarantee. By stipulation, the California Children's Lobby, the Professional Association of Childhood Educators, the California Assocation for the Education of Young Children, and the Child Development Administrators Assocation, intervened in the action as real parties in interest. The trial court issued a writ of mandate prohibiting defendants from including any funds allocated to or administered by any entity or agency other than a school district as defined in Education Code section 41302.5, within the Proposition 98 educational funding guarantees, and declaring that Education Code sections 8203.5, subdivision (c), and 41202, subdivision (f), which include funding for the Child Care and Development Services Act within the Proposition 98 guarantees, are unconstitutional. Bill Honig, the State Superintendent of Public Instruction, and the real parties in interest appeal. We shall reverse.

I

PROCEDURAL BACKGROUND

Proposition 98 provides for the improvement of public education in two basic ways. The first, which is not implicated in this appeal, involves the allocation of state revenues in excess of the state appropriations limitation to elementary, high school and community college districts on a per-enrollment

basis for use solely for the purposes of instructional improvement and accountability. (Cal. Const., art. XIII B, § 2; art. XVI, § 8.5.) The second way, and the one involved here, establishes a minimum guaranteed state education funding level for "the moneys to be applied by the State for the support of school districts and community college districts . . . ." (Cal. Const., art. XVI, § 8, subd. (b).)[2]

After its passage, the Legislature acted to implement Proposition 98. (Ed. Code, § 41200 et seq. [unless otherwise specified, all further statutory references will be to the Education Code].) One aspect of the Legislature's implementation is at issue in this appeal. As we have noted, in section 41202, subdivision (f), the Legislature provided, among other things: " 'State General Fund revenues appropriated for school districts and community college districts, respectively' and 'monies to be applied by the state for the support of school districts and community college districts,' as used in Section 8 of Article XVI of the California Constitution, shall include funds appropriated for the Child Care and Development Services Act pursuant to Chapter 2 (commencing with Section 8200) of Part 6 . . . ."

In order to ensure that the Child Care and Development Services Act serves the purposes of public education, the Legislature enacted section 8203.5, which provides: "(a) The Superintendent of Public Instruction shall ensure that each contract entered into under this chapter to provide child care and development services, or to facilitate the provision of those services, provides support to the public school system of this state through the delivery of appropriate educational services to the children served pursuant to the contract. [¶] (b) The Superintendent of Public Instruction shall ensure that all contracts for child care and development programs include a requirement that each public or private provider maintain a developmental profile to appropriately identify the emotional, social, physical, and cognitive growth of each child served in order to promote the child's success in the public schools. To the extent possible, the State Department of Education shall provide a developmental profile to all public and private providers using existing profile instruments that are most cost efficient. The provider of any program operated pursuant to a contract under Section 8262 shall be responsible for maintaining developmental profiles upon entry through exit from a child developmental program. [¶] Notwithstanding any other provision of law, 'moneys to be applied by the [s]tate,' as used in subdivision (b) of

---

[2]Under Proposition 98 the minimum funding level is set as the greater of (1) the same percentage of general fund revenues as was set aside for school districts and community colleges in the 1986-1987 school year, or (2) the amount necessary to ensure that total state and local allocations be equal to the prior year's allocations, adjusted for cost of living and enrollment changes. (Cal. Const., art. XVI, § 8, subd. (b).) A third test was added at the June 1990 Primary Election by the passage of Proposition 111. That measure is not involved here.

Section 8 of Article XVI of the California Constitution, includes funds appropriated for the Child Care and Development Services Act pursuant to Chapter 2 (commencing with Section 8200) of Part 6, whether or not those funds are allocated to school districts, as defined in Section 41302.5, or community college districts. [¶] (d) This section is not subject to Part 34 (commencing with Section 62000)."[3]

---

[3]In an uncodified provision the Legislature explained its purpose for including child care and development funds in the Proposition 98 funding guarantee: "The Legislature finds and declares as follows: [¶] (a) Since 1932, early childhood education and child development programs have been operated as part of the school programs that are conducted under the authority of the Superintendent of Public Instruction. In the 1988-89 fiscal year, 110,000 children in California were served in the state program of early childhood education and child development administered by the Superintendent of Public Instruction, as set forth in Chapter 2 (commencing with section 8200) of Part 6 of the Education Code. [¶] (b) Participation and enrollment in an early childhood education or child development program provides an opportunity for many children to hear their first English words (one in three speaks another language), to be introduced to the idea of numbers, to develop basic language concepts, to learn how to get along with other children and adults, and to begin to develop a positive self-image. [¶] (c) The Legislature has stated its intent that early childhood education and child development programs be a 'concomitant part of the educational system' by providing young children an equal opportunity for later school success. Those programs are considered by the general public to be an integral and essential part of the state's public education system. [¶] (d) Early childhood education programs for chldren of low-income families have been shown to increase high school graduation rates and college entry rates, to reduce the need for special education and grade level retention, and to reduce high school dropout rates. [¶] (e) In the state's early childhood education and development programs, each child is to receive an education program which is appropriate to his or her developmental, cultural, and linguistic needs. Each child is to receive a developmental profile, updated at regular intervals, which will be passed on to his or her elementary school. [¶] (f) In view of the unique function of early childhood education and child development programs, in supporting school districts by directly preparing children for participation in the public schools and by assisting those children in resolving special school-related problems, these programs constitute an essential and integral component of the overall system to carry out the mission of the public schools. Accordingly, in order to fully implement subdivision (b) of Section 8 of Article XVI of the California Constitution, which requires, in its introductory paragraph, a minimum level of funding 'for the support of' school districts, as defined, and community college districts, it is necessary to include, within the calculation of that funding, the funding provided by the Legislature for all early childhood education and development programs. Moreover, in accordance with the educational role of those programs, it is the responsibility of the Superintendent of Public Instruction to continue to ensure that all contracts for early child-hood education and child develpment programs provide support to the public school system of this state through the delivery of appropriate educational services to the children served by the program. In addition, Section 8262.1 of the Education Code, as added by this act [in fact there is no section 8262.1], constitutes a necessary statutory implementation of that determination, which is consistent with the legislative history of the statutes that provide for the operation of early childhood education and child development programs. [¶] (g) For the period from the 1986-87 fiscal year to the present, the state's early childhood education and development programs have received funding adjustments for cost-of-living and enrollment increases that have been lower, overall, than the comparable adjustments for base revenue limits for school districts. [¶] However, it is the intent of the Legislature that the inclusion of early childhood

The Child Care and Development Services Act is contained in sections 8200 through 8498. It is a comprehensive statewide master plan for child care and development services for children to age 14 and their parents. (§ 8201, subd. (a).) Among other things it includes such items as resource and referral programs (§§ 8210-8215), campus child care and development programs (§ 8225), migrant child care and development programs (§§ 8230-8233), preschool programs (§ 8235), general child care and development programs (§§ 8240-8242), and programs for children with special needs (§§ 8250-8252). Services under this statutory scheme may be provided directly by school districts or local education agencies or by contracts through such agencies, or services may be provided by private parties contracting with the state Department of Education. (See rep., Child Development, Program Facts, prepared by the Dept. of Ed., Child Development Div., Field Services Branch (1989) pp. 12-13.) Programs under the Child Care and Development Services Act are under the general supervision of the Superintendent of Public Instruction. (§ 8203.) In some instances federal funding is available and the Legislature has declared that federal reimbursement shall be claimed where available and that the Department of Education is designated as "the single state agency" responsible for the programs under federal requirements. (§§ 8205-8207.)

Plaintiffs filed this action to prohibit the inclusion of funding for the Child Care and Development Services Act within the Proposition 98 education funding guarantee.[4] They maintain that funds which are not allocated directly to and administered by school districts cannot be included within the provisions of Proposition 98.[5] The trial court agreed with plaintiffs. It concluded that Proposition 98 is not intrinsically ambiguous and that its

education and child development programs within the calculation of the state's education funding obligation pursuant to Proposition 98 is not to result in requiring in that calculation the use of the lower level of funding received by these programs in the 1986-87 fiscal year." (Stats. 1989, ch. 1394, § 1.)

[4]Plaintiffs also contested the inclusion of funding for certain other types of programs within the Proposition 98 guarantee. In his answer defendant Bill Honig, as Superintendent of Public Instruction, conceded that plaintiffs are correct with respect to these other programs and no other party contests this concession. This appeal concerns only funding for the Child Care and Development Services Act.

[5]The Director of the Department of Finance, filed an answer in which he agreed with plaintiffs and he is a respondent in this appeal. The former state Treasurer successfully demurred on the ground that his function in this regard is purely ministerial and the Treasurer is not a party on appeal. Defendant Honig contested the petition with respect to child care and development programs and he is an appellant herein. As we have noted, the parties stipulated that the Children's Lobby et alia be permitted to intervene as real parties in interest and they are also appellants in this appeal. Amici curiae briefs in support of appellants have been filed by the state Legislature, the California Congress of Parents, Teachers and Students, Inc., and certain child advocacy and care provider organizations.

plain meaning requires that only appropriations allocated to, and administered by, school districts satisfy its minimum funding requirement. As the trial court saw it, "[t]he phrase 'monies to be applied by the state for the support of school districts,' taken as a whole, clearly refers to financial allocations for the financial support of school districts, and not the financial support of private child care and development programs which incidentallly benefit school districts." Judgment was entered accordingly and this appeal followed.

## II

### HISTORICAL BACKGROUND

There can be no doubt that education has historically been accorded an ascendant position in this state. Indeed, at the very start, article IX of our 1849 Constitution created the office of Superintendent of Public Instruction; required the Legislature to encourage by all suitable means the promotion of intellectual, scientific, moral and agricultural improvement; required the Legislature to establish a system of common schools; and established a fund for the support of the common schools. (See Stats. 1849, p. 32.) As this recitation will demonstrate, the preeminent position of education in California has been a constant in a world of governmental flux. Section 1 of article IX of the Constitution now provides, as it has since 1879: "A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the Legislature shall encourage by all suitable means the promotion of intellectual, scientific, moral, and agricultural improvement." Section 5 of article IX presently mandates, as it has since 1879: "The Legislature shall provide for a system of common schools by which a free school shall be kept up and supported in each district at least six months in every year, after the first year in which a school has been established." Since 1933, our Constitution has provided that from state revenues there shall first be set apart the moneys to be applied by the state for the support of the public school system and institutions of higher education. (Cal. Const., art. XVI, § 8, subd. (a); see former art. XIII, § 15, Stats. 1935, p. IXIX.)

Section 6 of article IX of our Constitution establishes a State School Fund. That section provides, in relevant part: "The Legislature shall add to the State School Fund such other means from the revenues of the State as shall provide in said fund for apportionment in each fiscal year, an amount not less than one hundred eighty dollars ($180) per pupil in average daily attendance in the kindergarten schools, elementary schools, secondary schools, and technical schools in the Public School System during the next

preceding fiscal year. [¶] The entire State School Fund shall be apportioned in each fiscal year in such manner as the Legislature may provide, through the school districts and other agencies maintaining such schools, for the support of, and aid to, kindergarten schools, elementary schools, secondary schools, and technical schools except that there shall be apportioned to each school district in each fiscal year not less than one hundred twenty dollars ($120) per pupil in average daily attendance in the district during the next preceding fiscal year and except that the amount apportioned to each school district in each fiscal year shall be not less than twenty-four hundred dollars ($2,400)."

Article IX, section 6, of the Constitution also provides in part: "The Public School System shall include all kindergarten schools, elementary schools, secondary schools, technical schools, and State colleges, established in accordance with law and, in addition, the school districts and other agencies authorized to maintain them. ▉ ▬ ▬ No school or college or any other part of the Public School System shall be, directly or indirectly, transferred from the Public School System or placed under the jurisdiction of any authority other than one included within the Public School System."[6]

For the administration of this public school system, the Constitution creates the office of Superintendent of Public Education and establishes a State Board of Education. (Cal. Const., art. IX, §§ 2, 2.1.) It provides for county boards of education and superintendents of schools. (Cal. Const., art. IX, §§ 3-3.3.) It permits city charters to provide for the election or appointment of boards of education. (Cal. Const., art. IX, § 16.) Section 14 of article IX provides: "The Legislature shall have power, by general law, to provide for the incorporation and organization of school districts, high school districts, and community college districts, of every kind and class, and may classify such districts. [¶] The Legislature may authorize the governing boards of all school districts to initiate and carry on any programs, activities, or to otherwise act in any manner which is not in conflict with the laws and purposes for which school districts are established."

▉ It has been and continues to be the legislative policy of this state to strengthen and encourage local responsibility for control of public education

---

[6] The University of California is a public trust which finds its roots in the Constitution of 1849. (See Stats. 1849, p. 32; and see Cal. Const., art. IX, § 9.) The University of California has "full powers of organization and government" subject only to limited legislative control. (*Ibid.*) As such, it is not part of the Public School System and is subject to entirely different legal standards. The University of California is beyond the scope of the issues presented in this appeal.

through local school districts. (§ 14000.)[7] Nevertheless, education and the operation of the public schools remain matters of statewide rather than local or municipal concern. (*Hall* v. *City of Taft* (1956) 47 Cal.2d 177, 179 [302 P.2d 574]; *Esberg* v. *Badaracco* (1927) 202 Cal. 110, 115-116 [259 P. 730]; *Kennedy* v. *Miller* (1893) 97 Cal. 429, 431 [32 P. 558]; *Whisman* v. *San Francisco Unified Sch. Dist.* (1978) 86 Cal.App.3d 782, 789 [150 Cal.Rptr. 548].) Hence, local school districts are deemed to be agencies of the state for the administration of the school system and have been described as quasi-municipal corporations. (*Hall* v. *City of Taft, supra,* 47 Cal.2d at p. 181; *Pass School Dist.* v. *Hollywood Dist.* (1909) 156 Cal. 416, 418 [105 P. 122]; *Hughes* v. *Ewing* (1892) 93 Cal. 414, 417; *Town of Atherton* v. *Superior Court* (1958) 159 Cal.App.2d 417, 421 [324 P.2d 328].) Thus, a school district is not a distinct and independent body politic and is not free and independent of legislative control. (*Allen* v. *Board of Trustees* (1910) 157 Cal. 720, 725-726 [109 P. 486].)

■ The Legislature's power over the public school system has been variously described as exclusive, plenary, absolute, entire, and comprehensive, subject only to constitutional constraints. (*Hall* v. *City of Taft, supra,* 47 Cal.2d at p. 181; *Pass School Dist.* v. *Hollywood Dist., supra,* 156 Cal. at p. 419; *San Carlos Sch. Dist.* v. *State Bd. of Education* (1968) 258 Cal.App.2d 317, 324 [65 Cal.Rptr. 711]; *Town of Atherton* v. *Superior Court, supra,* 159 Cal.App.2d 417, 421.) Indeed, it is said that the Legislature cannot delegate ultimate responsibility over education to other public or private entities. (*Hall* v. *City of Taft, supra,* 47 Cal.2d at p. 181; *Piper* v. *Big Pine School* Dist. (1924) 193 Cal. 664, 669 [226 P. 926].) Consequently, regulation of the education system by the Legislature will be held to be controlling over any inconsistent local attempts at regulation or administration of the schools. (*Hall* v. *City of Taft, supra,* 47 Cal.2d at p. 181; *Esberg* v. *Badaracco, supra,*

---

[7]Although state funding for education is designed to enhance local responsibility for education, the Legislature has found it undesirable to yield total monetary authority to school districts. In the Statutes of 1981, chapter 100, section 1, at page 653, it is said: "The Legislature finds and declares that as a matter of policy the setting aside of categorical support for school districts is necessary to ensure the adequate funding for programs such as the provision of textbooks, pupil transportation, teacher retirement, special education for individuals with exceptional needs, and for educationally disadvantaged youths. The Legislature supports this policy of appropriating separately funds for special purposes because it provides funds for the intended purposes of the programs and because the substantial variation from district to district in terms of financial need for the programs cannot be accommodated adequately in general school support formulas. Although this act does not appropriate funds for inflation for categorical programs, it is the intent of the Legislature that, because categorical programs provide essential educational services, these programs should receive general inflation funds as provided in the Budget Act for other state programs." Our Supreme Court has determined that under our Constitution education is uniquely important and cannot be left totally under local monetary control. (*Serrano* v. *Priest* (1971) 5 Cal.3d 584, 614 [96 Cal.Rptr. 601, 487 P.2d 1241].)

202 Cal. at pp. 115-116; *Whisman v. San Francisco Unified Sch. Dist., supra,* 86 Cal.App.3d at p. 789.) And no one may obtain rights vested against state control by virtue of local provisions, ordinances or regulations. (*Whisman v. San Francisco Unified Sch. Dist., supra,* 86 Cal.App.3d at p. 789.)

The Legislature, in the exercise of its sweeping authority over education and the school system, has the power to create, abolish, divide, merge, or alter the boundaries of school districts. (*Allen v. Board of Trustees, supra,* 157 Cal. at pp. 725-726; *Pass School Dist. v. Hollywood Dist., supra,* 156 Cal. at p. 418; *Hughes v. Ewing, supra,* 93 Cal. at p. 417.) Indeed, the state is the beneficial owner of school property and local districts hold title as trustee for the state. (*Hall v. City of Taft, supra,* 47 Cal.2d at pp. 181-182; *Chico Unified Sch. Dist. v. Board of Supervisors* (1970) 3 Cal.App.3d 852, 855 [84 Cal.Rptr. 198]; *Town of Atherton v. Superior Court, supra,* 159 Cal.App.2d at p. 421.) "School moneys belong to the state, and the apportionment of funds to a school district does not give that district a proprietary right therein." (*Butler v. Compton Junior College Dist.* (1947) 77 Cal.App.2d 719, 729 [176 P.2d 417]; see also *Gridley School District v. Stout* (1901) 134 Cal. 592, 593 [66 P. 785].) It follows that the Legislature can transfer property and apportion debts between school districts as it sees fit. (*Pass School Dist. v. Hollywood Dist., supra,* 156 Cal. at pp. 418-419; *Hughes v. Ewing, supra,* 93 Cal. at p. 417; *San Carlos Sch. Dist. v. State Bd. of Education, supra,* 258 Cal.App.2d at p. 324.)

While few will deny the critical importance of education, the needs of the public education system often conflict with other desires of the electorate, especially that of minimizing the tax burden imposed upon the populace. Fewer still would deny that financing the public educational system in this state is Byzantine in its intricacy and complexity. Public education financing involves two basic, broad, and interrelated problems: public school resource production (how the funds are raised), and public school resource deployment (how the funds are spent). (See Andrews, *Serrano II: Equal Access to School Resources and Fiscal Neutrality—A View From Washington State* (1977) 4 Hast. Const.L.Q. 425, 429, fn. 18 [hereafter *Equal Access to School Resources*].) Public school financing is complicated by such matters as whether revenue should be raised through state or local taxation or some combination of both (see *Serrano v. Priest* (1976) 18 Cal.3d 728, 747 [135 Cal.Rptr. 345, 557 P.2d 929] [hereafter *Serrano II*]; and see *Equal Access to School Resources, supra,* 4 Hast. Const.L.Q. at pp. 445-446); disparate tax base to units of average daily attendance (ADA) ratios among various districts (see *Serrano v. Priest, supra,* 5 Cal.3d at p. 592 [hereafter *Serrano I*]); the willingness (or ability) of local voters to authorize increased taxes or expenditures for education (see *Serrano II, supra,* 18 Cal.3d at p. 769); the

availability of federal funding for educational programs and the sometimes inflexible qualification criteria for such funding (see Stats. 1981, ch. 100, § 1.3, pp. 653-654); the differing needs of schools and their students (see Stats. 1981, ch. 100, § 1, p. 653); and the difficulty of determining what types of services or programs should or should not be included within the educational budget (see *Equal Access to School Resources, supra,* 4 Hast. Const.L.Q. at pp. 441-442.) Although these matters are by no means exhaustive, they do illustrate the inherent complexity involved in developing an adequate formula for school support.

In the past 20 years state funding for education has been significantly influenced by several legal and political events. The changes began in 1971, a time when the major source of school revenue was derived from local real property taxes. (*Serrano I, supra,* 5 Cal.3d at p. 592.) The state then contributed aid to school districts in two forms: "basic state aid," which was a flat financial grant per pupil per year; and "equalization aid," which was based upon the assessed valuation of property per pupil within the district. (*Id.* at p. 593.) This educational status quo was challenged in *Serrano I,* a class action in which the plaintiffs maintained that the public school financing system created disparate educational opportunities based upon wealth. It was asserted that due to a substantial dependence upon local property taxes children from wealthy districts received greater educational opportunities than children from poorer districts.[8] In 1971, the California Supreme Court held that wealth is a suspect classification and that education constitutes a fundamental interest and thus the state plan should be subjected to strict scrutiny under equal protection principles. (*Id.* at pp. 614-615.) The high court concluded that an educational system which produces disparities of opportunity based upon district wealth would fail to meet constitutional requirements and the action was remanded for trial of the factual allegations of the complaint. (*Id.* at p. 619.)

After *Serrano I,* the Legislature modified the formula for state education aid in an effort to eliminate its objectionable features. The parties stipulated that the modified formula should be considered at trial. (*Serrano II, supra,* 18

---

[8]It has been pointed out that the wealth of a school district will not necessarily reflect the wealth of families it serves. For example, a district might have a high assessed valuation to ADA ratio because it includes areas which are heavily developed for commercial or industrial purposes, yet serve families who live near such areas because they cannot afford to move to more affluent areas. Conversely, a suburban or rural district may serve relatively affluent students yet lack a high assessed valuation to ADA ratio because it lacks any commercially developed areas within its boundaries. In *Serrano I* the Court disregarded this possibility because it was reviewing a demurrer to a complaint which alleged that there was a correlation between the wealth of a district and its residents and for the more basic reason that it did not believe that disparities in educational opportunities could be permitted simply because they reflected the wealth of the district rather than the individual. (*Id.* at pp. 600-601.)

Cal.3d at pp. 736-737.) Also during the pendency of the trial court proceedings, the United States Supreme Court rendered its opinion in *San Antonio School District* v. *Rodriguez* (1973) 411 U.S. 1 [36 L.Ed.2d 16, 93 S.Ct. 1278]. There, the Texas public school financing system, which was substantially similar to ours, was upheld by the federal high court. The court concluded that the Texas system did not result in a suspect classification based upon wealth and did not affect a fundamental interest and thus needed only to meet the "rational relationship" test under equal protection principles. (*Id.* at pp. 33-34, 48-55, 61-62 [36 L.Ed.2d at pp. 42-43, 51-56, 59-60].) Thereafter the *Serrano* trial court held that California's public education financing scheme violated independent state equal protection guarantees. In *Serrano II*, the California Supreme Court affirmed the judgment of the trial court which gave the state six years for bringing the public school financing system into constitutional compliance. (18 Cal.3d at pp. 749, 777.)

Meanwhile, at the June 1978 Primary Election the voters enacted Proposition 13, which added article XIII A to the California Constitution. That measure changed California's real property tax system from a current value system to an acquisition value system and limited the tax rates which could be imposed upon real property. (See *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 220, 238 [149 Cal.Rptr. 239, 583 P.2d 1281].) In an effort to mitigate the effects of article XIII A upon local governments and schools, the Legislature enacted a bailout bill to distribute surplus state funds to local agencies. (See *Sonoma County Organization of Public Employees* v. *County of Sonoma* (1979) 23 Cal.3d 296, 297 [152 Cal.Rptr. 903, 591 P.2d 1].) Article XIII A also forced the state to assume a greater responsibility for financing the public school system. (§ 41060.)

In the November 1979 Special Statewide Election the voters enacted Proposition 4 to add article XIII B to the California Constitution. Article XIII B imposes limitations upon the power of all California governmental entities to appropriate funds for expenditures. (Cal. Const., art. XIII B, §§ 1, 8, subds. (a), (b).) Revenues received by any governmental entity in excess of its appropriations limit must be returned by a revision of tax rates or fee schedules within the next two fiscal years. (Cal. Const., art. XIII B, § 2.) The measure also provides that whenever the state mandates a new program or higher level of service upon local governments, it must provide a subvention of funds to reimburse local government for the added costs. (Cal. Const., art. XIII B, § 6.)

It can be seen that as a result of the events of the 1970's the already difficult task of financing public education was made even more formidable.

As a result of article XIII A, the state was forced to assume a greater share of the responsibility for funding education. Any formula for funding education would be required to meet equal protection principles as set forth in the *Serrano* decisions. And as a result of article XIII B, there was certain to be greater competition for the state revenues within the appropriations limit. It was against this background that the voters enacted Proposition 98 at the November 1988 General Election.

## III

### MATTERS NOT IN ISSUE

The question presented in this appeal can best be addressed when it is narrowed to its appropriate scope by elimination of what is not involved. We are not here concerned with whether the Child Care and Development Services Act in fact completely entails an educationally related program. ■ While the Legislature is given broad authority over education, it cannot divert education funds for other purposes. (*Crosby* v. *Lyon* (1869) 37 Cal. 242, 245.) But plaintiffs did not and cannot reasonably contend that the child care program under attack does not at least in part serve an educational purpose. Education is a broad and comprehensive matter. (*Board of Trustees* v. *County of Santa Clara* (1978) 86 Cal.App.3d 79, 84 [150 Cal.Rptr. 109].) It "[c]omprehends not merely the instruction received at school or college, but the whole course of training; moral, religious, vocational, intellectual, and physical. Education may be particularly directed to either the mental, moral, or physical powers and faculties, but in its broadest and best sense it relates to them all. [It includes the] [a]cquisition of all knowledge tending to train and develop the individual." (Black's Law Dict. (5th ed. 1979) p. 461, col. 2.) Our Constitution places a similarly broad meaning upon education when it requires the Legislature to "encourage by all suitable means the promotion of intellectual, scientific, moral, and agricultural improvement." (Cal. Const., art. IX, § 1.)[9] Moreover, under our Constitution the Legislature is given broad discretion in determining the types of programs and services which further the purposes of education. (*Veterans' Welfare Board* v. *Riley* (1922) 189 Cal. 159, 164-166 [208 P. 678, 22 A.L.R. 1531]; *University of So. California* v. *Robbins* (1934) 1 Cal.App.2d 523, 528 [37 P.2d 163].) It cannot be said that the Legislature has been arbitrary and unreasonable in its determination that the Child Care and Development Services Act furthers the purposes of public education.

We are not here concerned with the question whether the Legislature's implementation of Proposition 98 is partially invalid or invalid as applied.

---

[9]While "education" is sufficiently broad to include religious training, specific provisions of the state and federal Constitutions exclude religious training from governmental education programs. (U.S. Const., Amend. I; Cal. Const., art. I, § 4, art. IX, § 8.)

Plaintiffs claim that the inclusion of funding for the Child Care and Development Services Act within the Proposition 98 funding requirement is invalid in toto and on its face. They argue that Proposition 98 funds must be transferred to school districts which then have total discretion to determine how those funds should be spent. They did not present evidence or argument to establish that portions of the Child Care and Development Act lack a sufficient nexus to education to be included in education funding or that the manner in which it is carried out by the Superintendent of Public Instruction does not support and further the purpose of education. ■ "Because this is a challenge to the facial validity of the [the statute], our task is to determine whether the statute can constitutionally be applied. 'To support a determination of facial unconstitutionality, voiding the statute as a whole, petitioners cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute. . . . Rather, petitioners must demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions.' " (*Arcadia Unified School Dist.* v. *State Dept. of Education* (1992) 2 Cal.4th 251, 267 [5 Cal.Rptr.2d 545, 825 P.2d 438], italics in original.)

We are not here concerned with the advisability or wisdom of the Legislature's decision.[10] ■ Under our form of government, policymaking authority is vested in the Legislature and neither arguments as to the wisdom of an enactment nor questions as to the motivation of the Legislature can serve to invalidate particular legislation. (*City and County of San Francisco* v. *Cooper* (1975) 13 Cal.3d 898, 913 [120 Cal.Rptr. 707, 534 P.2d 403]; *County of Los Angeles* v. *Superior Court* (1975) 13 Cal.3d 721, 727 [119 Cal.Rptr. 631, 532 P.2d 495]; *Galvan* v. *Superior Court* (1969) 70 Cal.2d 851, 869 [76 Cal.Rptr. 642, 452 P.2d 930]; *Wilke & Holzheiser, Inc.* v. *Dept. of Alcoholic Bev. Control* (1966) 65 Cal.2d 349, 359 [55 Cal.Rptr. 23, 420 P.2d 735].) As a court of review our role is limited to determining whether the Legislature's choice is constitutionally prohibited. (*Ibid.*)

Furthermore, we are not concerned here with statutory inconsistency. Instead, the issue relates solely to the construction of constitutional provisions. Proposition 98 added certain statutory provisions to the Education Code. Section 13 of Proposition 98 provides: "No provision of this Act may be changed except to further its purposes by a bill passed by a vote of two-thirds of the membership of both houses of the Legislature and signed

---

[10]For this reason we deny the request of amici curiae that we take judicial notice of certain legislative materials. The submitted documents tend to establish the value of, and the need for, funding for child care and development programs. Those are matters within the Legislature's prerogative and we may not superintend its determination.

by the Governor." The legislation challenged by plaintiffs was enacted by the requisite two-thirds majorities and signed by the Governor. Accordingly, it is the constitutional provisions of Proposition 98 which are at issue in this case.

Finally, we are not here concerned with article XVI, section 8.5 of the Constitution, also added by Proposition 98. In that provision the voters determined that, within certain limits, state revenues in excess of the state appropriations limit should be used to improve education in the elementary and secondary schools and community colleges rather than be returned to the populace. The measure is self-executing; it requires no legislative action. Each year the Controller must transfer and allocate such excess revenues to the state school fund restricted for school districts and community colleges, and then must allocate those funds to the districts and community colleges on a per-enrollment basis. (Cal. Const., art. XVI, § 8.5, subds. (a), (c).) Those sums may be expended solely for purposes of instructional improvement and accountability. (Cal. Const., art. XVI, § 8.5, subd. (d).)

Article XVI, section 8.5 is an entirely different matter than article XVI, section 8. Section 8.5 deals with revenues which are constitutionally beyond the Legislature's spending prerogatives under article XIII B. Section 8.5 does not extend the Legislature's spending power to excess revenues; rather it imposes a self-executing, ministerial duty upon the Controller to transfer such excess revenues to a restricted portion of the school fund and thence to allocate such revenues to school districts and community college districts on a per-enrollment basis. Section 8.5 specifically restricts the purposes for which those funds may be expended. The specific provisions of section 8.5 would prohibit the Legislature from retaining and utilizing those funds for purposes of the Child Care and Development Services Act.

IV.

ISSUE ON APPEAL

In this case we are concerned with whether funding for the Child Care and Development Services Act is on its face beyond the educational funding requirements of article XVI, section 8, of the Constitution as enacted by Proposition 98.

Defendant Honig contends that the Legislature has plenary power to define how California's public school system operates as well as what entities constitute that system. Given that absolute authority, which remains undiminished by the enactment of Proposition 98, the Legislature was empowered to include funds for early childhood education and child development within the minimum funding guarantee established by that initiative.

He argues that the trial court, contrary to the settled and fundamental principles of constitutional adjudication, misconstrued the critical phrase "moneys to be applied by the State for the support of school districts" to be limited to funds directly allocated to school districts. In his view, "the definition of 'school districts' set forth in Proposition 98 is far from precise. Its uncertainty in fact made it necessary for the Legislature to refine and clarify which entities in the public school system were to be counted as falling within its minimum funding guarantee. This the Legislature did, three times. [¶] More importantly, nothing in Proposition 98 or any other provision of law either expressly or implicitly restricted the Legislature from including [the California Department of Education's] direct provision of child development services through contracts with private agencies within that guarantee. Since 1972, the Legislature has determined that private agencies, as well as public agencies, have been integral to the statewide provision of such services under the Child Development Act, and thereby to California's public school system. Accordingly, the Legislature's implementation of Proposition 98 in Sections 41202(f) and 8203.5(c) was not only possible and reasonable, it was consistent with its prior acts which made private agency child development services a recognized part of the public school system."

Plaintiffs counter that the plain language of Proposition 98 demonstrates that the funds must go directly to school districts and not to private entities contracting with the Department of Education. As they read the key phrase of the initiative, "monies to be applied by the State for the support of school districts" means funds "allocated to" or "appropriated for" school districts. Consequently, so their argument goes, the inclusion of non-school-district programs within the initiative's guarantee nullifies the central purpose of Proposition 98.

Real parties in interest argue alternatively that child development programs funded directly by the Department of Education are included within the phrase "school districts" but even if they are not, the Legislature has the power to amend the statutory definition of "school districts" contained in Proposition 98.

In analyzing these constitutional contentions we are bound by several fundamental principles of constitutional adjudication. " 'Unlike the federal Constitution, which is a grant of power to Congress, the California Constitution is a limitation or restriction on the powers of the Legislature. Two important consequences flow from this fact. First, the entire law-making authority of the state, except the people's right of initiative and referendum, is vested in the Legislature, and that body may exercise any and all legislative powers *which are not expressly, or by necessary implication*

*denied to it by the Constitution. . . .* [¶] Secondly, all intendments favor the exercise of the Legislature's plenary authority: "If there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action. *Such restrictions and limitations [imposed by the Constitution] are to be construed strictly, and are not to be extended to include matters not covered by the language used.*" ' (Italics added.)" (*Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 180 [172 Cal.Rptr. 487, 624 P.2d 1215], citing *Methodist Hosp. of Sacramento v. Saylor* (1971) 5 Cal.3d 685, 691 [97 Cal.Rptr. 1, 488 P.2d 161], citations omitted.)

■ Another principle of constitutional adjudication requires that the constitutional provisions added by Proposition 98 be considered in light of all other relevant provisions of the Constitution, including those that contain, define, and limit the status of school districts and their relationship to the state. "The initiative amendment to the [C]onstitution itself must be interpreted in harmony with the other provisions of the organic law of this state of which it has become a part. To construe it otherwise would be to break down and destroy the barriers and limitations which the [C]onstitution, read as a whole, has cast about legislation, both state and local." (*Galvin v. Board of Supervisors* (1925) 195 Cal. 686, 692 [235 P. 450]. See also *Edler v. Hollopeter* (1931) 214 Cal. 427, 430 [6 P.2d 245].) In *Galvin v. Board of Supervisors, supra,* 195 Cal. 686, the petitioners sought to compel a county board of supervisors to submit an initiative ordinance to the local voters. The Supreme Court held that the provisions of the Constitution which reserve the initiative power to local voters must be construed in light of other provisions which contain, define, and limit the scope of permissible local legislation. (*Id.* at p. 692.) This precluded local voters from accomplishing by initiative that which was beyond the powers of the local board of supervisors. (*Id.* at p. 693. See also *Giddings v. Board of Trustees* (1913) 165 Cal. 695, 698 [133 P. 479].) That principle of construction applies here.

■ When we consider Proposition 98 in light of other provisions of our Constitution, specifically article IX, which is devoted to education, and the long, unbroken line of authorities interpreting such provisions, we must reject an underlying premise of plaintiffs' argument. According to plaintiffs, the challenged legislation is invalid because it divests school districts of complete and total control over the funds the state is required to devote to education under Proposition 98. As plaintiffs put it: "Of course, if a school district decides to use part of its funding for child care and development programs, it is entitled to do so. It is also entitled to ignore child care and development altogether, and use its funding for other programs that it considers to be a higher priority." Nothing in Proposition 98 states or implies

that school districts are to have the autonomy claimed by plaintiffs. Article IX, section 5, of our Constitution still provides for one system of common schools, which implies a "unity of purpose as well as an entirety of operation, and the direction to the [L]egislature to provide 'a' system of common schools means *one* system which shall be applicable to all the common schools within the state." (*Kennedy* v. *Miller* (1893) 97 Cal. 429, 432 [32 P. 558], italics original; see also *Serrano I, supra,* 5 Cal.3d at p. 595.)

Since Proposition 98 did not alter the state's role in education, the Constitution continues to make education and the operation of the public schools a matter of statewide rather than local or municipal concern. (*Hall* v. *City of Taft, supra,* 47 Cal.2d at p. 179; *Esberg* v. *Badaracco, supra,* 202 Cal. at pp. 115-116; *Kennedy* v. *Miller, supra,* 97 Cal. at p. 431; *Whisman* v. *San Francisco Unified School Dist., supra,* 86 Cal.App.3d at p. 789.) Local school districts remain agencies of the state rather than independent, autonomous political bodies. (*Allen* v. *Board of Trustees, supra,* 157 Cal. at pp. 725-726.) The Legislature's control over the public education system is still plenary. (*Hall* v. *City of Taft, supra,* 47 Cal.2d at pp. 180-181; *Pass School Dist.* v. *Hollywood Dist., supra,* 156 Cal. at p. 419; *San Carlos Sch. Dist.* v. *State Bd. of Education, supra,* 258 Cal.App.2d at p. 324; *Town of Atherton* v. *Superior Court, supra,* 159 Cal.App.2d at p. 421.) The Legislature still has ultimate and nondelegable responsibility for education in this state. (*Hall* v. *City of Taft, supra,* 47 Cal.2d at p. 181; *Piper* v. *Big Pine School Dist., supra,* 193 Cal. at p. 669.) All school properties are still held in trust with the state as the beneficial owner. (*Hall* v. *City of Taft, supra,* 47 Cal.2d at p. 182; *Chico Unified Sch. Dist.* v. *Board of Supervisors, supra,* 3 Cal.App.3d at p. 855; *Town of Atherton* v. *Superior Court, supra,* 159 Cal.App.2d at p. 421.) And school districts still do not have a proprietary interest in moneys which are apportioned to them. (*Gridley School District* v. *Stout, supra,* 134 Cal. at p. 593; *Butler* v. *Compton Junior College Dist., supra,* 77 Cal.App.2d at p. 729.) Of course, if the electorate chose to alter our constitutional scheme for education it could do so. Education could be made a matter of local concern and school districts could be given greater autonomy. But we cannot conclude that such a major governmental restructuring was accomplished by implication in a measure dealing with public finance which spoke not at all on such matters.

In light of the Legislature's plenary authority over education and its legal relationship with school districts, we do not find Proposition 98 to be clear and unambiguous as asserted by plaintiffs. The measure establishes a minimum sum for "the monies to be applied by the state for the support of school districts and community college districts . . . ." Rather than expressly divesting the state of its traditional authority over education funds,

this provision would appear to retain state control since the moneys are to be "applied by the state." The measure does not expressly restrict the Legislature's plenary authority nor does it grant to school districts exclusive control over education funds. Had such a result been intended there are any number of linguistic formulations which could have so specified with adequate clarity. As a court, we cannot impose limitations or restrictions upon the Legislature's prerogatives in the absence of language reasonably calculated to require such a result when subjected to strict construction. (*Pacific Legal Foundation* v. *Brown, supra,* 29 Cal.3d at p. 180.)

Given plaintiffs' facial attack, it is enough to hold, as we do, that legislative programs which advance, and hence support, the educational mission of school districts and community college districts may constitutionally be included within the funding guarantee of Proposition 98. It cannot be said that the Child Care and Development Services Act totally and on its face fails to meet this test.[11] This is as far as we need go in this case. The plaintiffs asserted, and the judgment holds, that only funds allocated to and administered by school districts satisfy the requirements of Proposition 98. Such a conclusion improperly grants school districts a proprietary interest in school funds and gives them a degree of political autonomy in contravention to the Legislature's long-standing and well-established plenary authority over education in this state. Since we do not find such a fundamental governmental restructuring in Proposition 98, we must reject the reasoning of the trial court and reverse its judgment.

## SUMMARY AND CONCLUSION

In this state, education is a matter of statewide rather than local or municipal concern. Local school districts are agencies of the state subject to the Legislature's plenary authority over education. Local school districts do not have political autonomy and have no proprietary interest in the properties or moneys they hold in trust for the state. Proposition 98 set forth minimum sums to be applied by the state for the support of school districts and community colleges. This measure does not deprive the Legislature of

---

[11]In reaching this conclusion we reject real parties' contention that the Legislature has impliedly defined programs under the Child Care and Development Services Act as being within the definition of "school districts." Section 41302.5 defines the agencies which are included within the phrase "school district" as used in Proposition 98. In implementing Proposition 98 the Legislature referred to that section but did not see fit to amend it to include child care and development programs. (§ 41202, subd. (f).) And in section 8203.5, subdivision (c), the Legislature included Child Care and Development Services Act funding within the Proposition 98 guarantee "whether or not those funds are allocated to school districts . . . ." By so providing the Legislature clearly chose not to include child care and development programs within the definition of school districts.

its plenary authority over education and does not grant school districts political autonomy or a proprietary interest in the minimum funding to be applied by the state for support of school districts and community colleges. Accordingly, we reject the assertion that all funds within the minimum funding requirements of Proposition 98 must be allocated to, and administered by, school districts. Our opinion goes no further. While the Legislature's authority over education and education funding is broad, it is not unlimited. Our conclusion that Proposition 98 did not divest the Legislature of its traditional authority over education should not be construed to foreclose specific challenges to the Legislature's decisions based upon appropriate factual and legal showings. We hold only that the decision to include funding for the Child Care and Development Services Act within the Proposition 98 minimum funding guarantees is not in toto and on its face beyond the Legislature's constitutional authority.

## DISPOSITION

The judgment is reversed. Appellant Honig shall recover his costs on appeal.

Marler, J., and Nicholson, J., concurred.

A petition for a rehearing was denied May 27, 1992, and the petition of plaintiffs and respondents for review by the Supreme Court was denied July 30, 1992. Mosk, J., was of the opinion that the petition should be granted.