[No. H011079. Sixth Dist. Sept. 27, 1994.]

WILLIAM D. DAWSON, as Acting Superintendent of Public Instruction etc., et al., Plaintiffs and Appellants.
EAST SIDE UNION HIGH SCHOOL DISTRICT, Defendant and Respondent;
WHITTLE COMMUNICATIONS, L. P., Intervener and Appellant.

**COUNSEL**

Joseph R. Symkowick and Michael E. Hersher for Plaintiffs and Appellants.

Cadwalader, Wickersham & Taft, John E. McDermott and Aimee Dominguez Silvers for Intervener and Appellant.

Diane Ross, Beverly Tucker, A. Eugene Huguenin, Jr., and Ramon E. Romero as Amici Curiae on behalf of Intervener and Appellant.

Ruiz & Schapiro, Celia M. Ruiz, Susan E. Brown and Priscilla S. Carson for Defendant and Respondent.

**OPINION**

**BAMATTRE-MANOUKIAN, J.**—These appeals require answers to four questions:

(1) Whether the trial court properly rejected the contention of the California Superintendent of Public Instruction, and other plaintiffs, that a public school district may never lawfully contract for classroom display of "Channel One," a current events video program which contains commercial advertisements;

(2) Whether the trial court correctly concluded that "Channel One" may lawfully be used by a school district only so long as the students are not coerced to view the advertisements;

(3) Whether in the circumstances of record the trial court properly granted injunctive relief which, in practical effect, compelled a school district to adopt, as a condition of continued use of "Channel One," court-specified procedures by which students could "opt out" by choosing not to watch the programming; and

(4) Whether in the circumstances of record the trial court could properly retain jurisdiction to appoint, without a further showing of need, a qualified individual to monitor the parties' compliance with the judgment.

We shall conclude that the third and fourth questions must be answered in the negative but shall answer the first and second questions in the affirmative. We shall modify the trial court's judgment in light of our answers, and shall affirm the judgment as so modified.

Intervener Whittle Communications, L.P., a limited partnership, characterizes itself as a developer and publisher, for profit, of informational material including video programs. Beginning in 1987 Whittle developed a concept of short current-events video programs for teenaged students. Whittle determined that middle schools and high schools would want to use such programs but would find it difficult to pay for the programs or for video equipment to display the programs. Whittle concluded that it could provide both programs and equipment without direct cost to the schools, and could nevertheless realize an adequate profit, by selling commercial advertising time in its video programs to advertisers interested in penetrating the teenage market. The upshot was "Channel One," a daily 12-minute video program which integrates 10 minutes of fast-paced current events coverage designed to appeal to teenaged students with slots for a total of 2 minutes of advertising in a format indistinguishable from ordinary television commercials.

Although Whittle expresses pride in the quality of its current-events coverage, it has made clear from the outset that its motivation is the profit to

be made, and that its profit depends on Whittle's ability to persuade advertisers that "Channel One" is a viable advertising medium: That "Channel One" will effectively convey the advertisers' sales solicitations to a significant segment of the target market of teenaged consumers.

To develop a market sufficient to attract the advertisers who would ultimately provide its profit, Whittle has packaged "Channel One" with other educational programming which does not contain commercials and has offered to furnish the package, known as the Whittle Educational Network, together with television sets, a satellite receiver, cabling, and other electronic equipment to be installed by Whittle, to school districts "without any charge or fee." Whittle makes quite clear that its willingness to provide this package will be conditioned in each instance on the likelihood that Whittle will thus significantly add to the market it can offer to its advertisers. Whittle acknowledges that it is "free not to contract if viewership is too small . . . ." Whittle's printed form "district agreement" is made subject to a number of terms, conditions, and "responsibilities of the School" many of which are patently intended to provide assurances to advertisers and in other ways to serve Whittle's profit motive. For example:

(1) "The School agrees to provide to Whittle once a year upon request the annual schoolwide daily attendance figures and change of enrollment information." Whittle may terminate the agreement if enrollment declines more than 25 percent from enrollment at the beginning of the three-year agreement term; implicitly Whittle could decline to enter into an agreement with a district in which it considered enrollment insufficient. Also, although a school could elect not to have television sets installed in certain of its classrooms, "[t]he number of television sets to be installed must be mutually agreeable to Whittle and the School."

(2) Although a school can use Whittle's equipment for purposes other than to broadcast Whittle Educational Network materials, "written approval by Whittle is required should the School desire to show any other news program specifically designed for viewing by teenagers in schools and which contains advertising." Nor may the school use Whittle's wiring without Whittle's prior written consent, even after termination of the agreement, "to service equipment provided by another entity to show its programs designed for a teenage audience and containing advertisements."

(3) "The School agrees . . . to either show the entire daily ["Channel One"] newscast on all installed television sets or not show it at all. . . . *Channel One* must be shown when students are present in a homeroom or classroom . . . . The only penalty to the School for not showing *Channel*

*One* is that Whittle may terminate this agreement and remove the Equipment."

(4) "If the School does not consistently show *Channel One* (i.e., on at least 90% of the days the School is in session and *Channel One* is transmitted), then Whittle may terminate this agreement."

On the other hand Whittle's form agreement specifies that its twelve-minute "Channel One" newscasts "will include not more than two minutes of commercial content" and that the commercial content "will be limited to materials suitable for teenagers" in accordance with detailed written "standards and guidelines" attached to the agreement. The agreement also explicitly takes account of the possibility that individual students may elect not to watch "Channel One": "This agreement does not require that all teachers use *Channel One* or that all students or any particular student view *Channel One*. The School may at its discretion develop appropriate procedures to accommodate students who do not wish to view *Channel One* or whose parents do not wish them to view *Channel One*."

Beginning with pilot tests in 1988, Whittle has achieved remarkable success in persuading school districts nationwide to agree to accept Whittle Educational Network programming and equipment. The record includes videotapes of several "Channel One" segments, all of which skillfully present current events material written to be interesting and comprehensible to teenaged viewers. Advertisements for products such as fast foods, candy bars and snacks, soft drinks, and deodorants are smoothly integrated into the presentation but readily identifiable as commercial rather than editorial content. In some instances public service announcements—for example, warnings against drug abuse or drunk driving—are substituted for advertisements: The record reflects that Whittle uses such announcements to fill slots allocated to, but for which it has been unable to sell, advertising. The overall impression is of a television-like presentation of uniformly high quality, broadly comparable to current events programs on commercial television channels, but tailored to appeal to teenaged viewers.

In August 1989 California's Superintendent of Public Instruction, in a letter addressed to county and district school superintendents, took a strong position against use of "Channel One" in California public schools. He concluded "that participation by public schools in proposals such as 'Channel One' is not permitted by state law and the California Constitution. Based on California Education Code section 46000, I cannot pay schools to have their students watch commercials. Therefore, I will not certify as 'instructional minutes' any time spent watching advertisements in any broadcast

similar to that proposed by 'Channel One.'" Presumably the Superintendent of Public Instruction was referring to his statutory power to certify average daily attendance for the purpose of apportioning state funds to local school districts. (Cf. Ed. Code, §§ 14000 et seq., 46000 et seq.) He suggested that Whittle's proposal, "even if it were legal, should be resisted for ethical and educational reasons. Parents entrust their children to our public schools. We have no right *legally* or *morally* to sell access to our students even if schools receive some benefit in return." The Superintendent of Public Instruction developed on these and similar arguments in considerable detail, characterizing "the crux of the issue" as "the illegal and unethical use of schools' unique access to an extremely valuable commercial audience which Whittle Communications wants to monopolize."

At the time the Superintendent of Public Instruction sent his letter, defendant and respondent East Side Union High School District had been considering "Channel One" and other elements of the Whittle Educational Network for installation and use at Overfelt High School for several months. The record supports the school district's statement that Overfelt "has an extremely high proportion of minority students . . . ; few students have the habit of news viewing or reading at home . . . ; most students are from low socioeconomic backgrounds . . . ; and a high percentage of students is considered 'at-risk' in terms of dropping out of school, drug abuse or teen pregnancy. . . . Further, the school's ability to deal with such problems is handicapped by the grim financial plight of both the State and the District itself, which make it difficult to fund even basic educational programs, much less special efforts to address specific local needs." After comparison to other similar video programs (which they found to be costly and not as well adapted to the district's needs) and extensive consultation with district teachers and parents (a substantial majority of whom approved of the "Channel One" concept) the school district administrators decided, subject to the approval of the district Board of Trustees, to contract with Whittle to receive the Whittle Educational Network.

In a letter to the chair of the Board of Trustees, in May 1990, the Superintendent of Public Instruction reiterated that, "I am unalterably opposed to public schools contracting for commercial television programs in the classroom during the school day." Notwithstanding the position taken by the Superintendent of Public Instruction, the Board of Trustees voted to approve a contract with Whittle, and Whittle's equipment was installed at Overfelt during the spring of 1990. No written contract was signed between the school district and Whittle, but apparently both the school district and Whittle have proceeded in accordance with the terms of Whittle's form agreement. Among other things, the record reflects that Whittle and the

school district agreed orally that "the District would not require students to watch Channel One but would instead make this an optional student activity," and that from the outset parents were advised "that students could opt out of viewing Channel One with parental permission."

It appears that "Channel One" has been regularly shown to students in Overfelt classrooms since no later than the fall of 1990. The video is displayed at the same time every day, during a 20-minute time period variously characterized in the record as "the communication period" and as "a period . . . exclusively to promote critical thinking and awareness of current events and important issues of concern to the students . . . ," and formerly used for "Sustained Silent Reading." In declarations in the record several teachers express strong support for the educational value of "Channel One." Some teachers use the advertisements themselves as instructional materials, asking students to evaluate the effectiveness and impact of various commercial presentations upon consumers; no party has criticized this use of the "Channel One" advertisements.

In October 1990 California's State Board of Education adopted a resolution, headed "USE OF COMMERCIAL TELEVISION ADVERTISING IN THE CLASSROOM," which stated the Board's belief that "decisions concerning the use of commercial products and services are within the decision making authority of the local governing boards, consistent with state law." The resolution encouraged local governing boards to use care in considering and auditing use of electronic media in the classroom. The Superintendent of Public Instruction forwarded this resolution to local school officials with a cover letter in which he stated that the resolution "has been characterized as supporting the use of . . . 'Channel One' " and that "I disagree with [the] resolution," and briefly reviewed his August 1989 arguments against "Channel One." The president of the State Board of Education then wrote to the same officials, stating that "the State Board of Education neither supports nor opposes the use of Channel One in the classroom. . . . Our resolution simply states that the decision concerning the use of commercial products and services are the domain of local governing boards, consistent with state law."

In December 1991 the Superintendent of Public Instruction, joined by the California Congress of Parents, Teachers, and Students, Inc., and by two teachers at Overfelt, sued the school district for preliminary and permanent injunctions against contracting for or using "Channel One," for a declaration that the school district's use of "Channel One" was illegal in various respects, and for ancillary relief. Whittle was granted leave to intervene in the lawsuit.

The trial court denied a preliminary injunction. By acquiescence of the parties the issues were tried on declarations, other written submissions, and argument by counsel. The trial court issued a lengthy and thoughtful memorandum of decision. After a further hearing and additional written submissions the trial court issued an "order determining submitted issues and directing issuance of permanent injunction" which altered its previously announced decision in some respects and refined it in others.

The judgment ultimately entered, and from which these appeals are taken, essentially incorporates the memorandum of decision "as modified and supplemented by" the subsequent order. Read together, these documents effected the following disposition:

(1) The trial court rejected the plaintiffs' contention that (as paraphrased by the court) "the mere presence in public schools of commercial advertising, even the type of advertising shown on 'Channel One,' is illegal per se."

(2) The court took the position that "[t]he law is offended only if students are coerced directly or indirectly into viewing commercial material or if the material they are shown has such great quantitative or qualitative impact upon the educational process that it cannot reasonably be considered to be incidental."

(3) The court concluded that there was no evidence of direct coercion but that "plaintiffs have demonstrated a reasonable possibility that indirect coercion of teachers and/or students with respect to 'Channel One' may be occurring or may occur in the future in the absence of appropriate safeguards . . . ." The court expressed the view that "coerced or otherwise involuntary viewing of 'Channel One' would violate both the letter and the spirit of California's compulsory education law . . . ."

(4) The court did not find "any convincing social scientific evidence," one way or the other, as to the impact of "Channel One" commercials on the educational process.

(5) On these bases the trial court ordered that the school district and Whittle "shall be permanently enjoined and restrained from broadcasting . . . 'Channel One' in any classroom during school hours in which students are required to be in class, except on the condition that formal policies and procedures which insure that student viewing of 'Channel One' is strictly voluntary are implemented and observed. No student shall be required to view 'Channel One,' nor shall a student's standing with his or her classroom teacher(s), school administration or school district be affected adversely by a

decision not to view 'Channel One.'" The court specified what would "constitute sufficient compliance" by the school district:

(a) The school district "shall inform in writing the parent or guardian of each student in each classroom in which it broadcasts or proposes to broadcast 'Channel One' . . . ,'" and each teacher in the district, of the student's right to opt out;

(b) The school district "shall provide a structured, supervised alternative activity during the time period in which 'Channel One' is broadcast," and shall provide "[s]ufficient time for student relocation . . . ;"

(c) All required written notices shall be given at the beginning of each semester, and opt-out decisions shall be operative for the entire semester subject to possible accommodation of the desires of individual parents or guardians to change initial elections during a semester.

(6) "Because the record shows that the institutional environment of the school is one in which the risk of coercion is always present, and because the effectiveness of the [prescribed] policies and procedures . . . in achieving the purposes of the injunctive relief . . . can be determined only in practice, the Court in the exercise of its inherent power to insure compliance with its orders and judgments shall retain jurisdiction to appoint a qualified individual to monitor [the school district's] compliance herewith."

The court also expressly retained "its inherent power to modify its orders and judgments in light of changed circumstances, including the availability of new social scientific evidence not available at the time of trial." The court declined to appoint an expert to evaluate the impact of commercial advertising in the classroom setting, and denied Whittle's request for a stay of the judgment.

The plaintiffs, the school district, and Whittle all appealed. (Cf. *Pahl* v. *Ribero* (1961) 193 Cal.App.2d 154, 160 [14 Cal.Rptr. 174] [final determination of issues presented by existing facts is appealable notwithstanding reservation of jurisdiction].)

The essence of the plaintiffs' position in this court, supported by amicus curiae California Teachers Association, is that it is unlawful in any circumstances for a public school district to contract for use in its classrooms of video programming which contains commercial advertising.

Whittle endorses the trial court's rejection of the plaintiffs' position, but challenges the court's determination that student viewing of the "Channel

One" commercials must be strictly voluntary and the court's orders requiring specified opt-out procedures and reserving jurisdiction to appoint a monitor.

The school district has abandoned its appeal, but supports Whittle's arguments.

To save words, we shall use the phrase "classroom video advertising" to mean commercial advertising embedded in video programming and displayed, or agreed or intended to be displayed, in public school classrooms during instructional time in furtherance of the advertisers' intent to persuade students to buy their goods or services.

### General Principles

Our consideration of the issues will take account of two broad and interrelated principles: That in California local school districts are granted substantial discretionary control of public education, and that in the exercise of this discretion the school districts have some latitude to adopt or permit uses or procedures which in and of themselves are not strictly educational so long as the uses or procedures are no more than incidental to valid educational purposes.

We shall conclude, on the other hand, that disposition of this matter is not ultimately controlled by constitutional provisions for protection of free speech.

### 1. Local Control

Since 1849 the California Constitution has contained a broad mandate for public education: "A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the Legislature shall encourage by all suitable means the promotion of intellectual, scientific, moral, and agricultural improvement." (Cal. Const., art. IX, § 1.)

By the terms of the mandate itself, primary authority over public education is vested in the Legislature (cf. also *Hall* v. *City of Taft* (1956) 47 Cal.2d 177, 179-183 [302 P.2d 574]; *California Teachers Assn.* v. *Hayes* (1992) 5 Cal.App.4th 1513, 1524-1525 [7 Cal.Rptr.2d 699]), but the Constitution, and the Legislature itself, have ceded substantial discretionary control to local school districts. Since 1973 the Constitution has provided that "[t]he Legislature may authorize the governing boards of all school districts to initiate and carry on any programs, activities, or to otherwise act in any

manner which is not in conflict with the laws and purposes for which school districts are established." (Cal. Const., art. IX, § 14.) The Legislature has echoed this constitutional provision in Education Code section 35160: "[T]he governing board of any school district may initiate and carry on any program, activity, or may otherwise act in any manner which is not in conflict with or inconsistent with, or preempted by, any law and which is not in conflict with the purposes for which school districts are established." In 1987, as "a clarification of existing law under Section 35160," the Legislature found and declared "that school districts, county boards of education, and county superintendents of schools have diverse needs unique to their individual communities and programs. Moreover, in addressing their needs, common as well as unique, school districts, county boards of education, and county superintendents of schools should have the flexibility to create their own unique solutions. [¶] . . . In enacting Section 35160, it is the intent of the Legislature to give school districts, county boards of education, and county superintendents of schools broad authority to carry on activities and programs, including the expenditure of funds for programs and activities which, in the determination of the governing board of the school district, the county board of education, or the county superintendent of schools are necessary or desirable in meeting their needs and are not inconsistent with the purposes for which the funds were appropriated. It is the intent of the Legislature that Section 31560 be liberally construed to effect this objective." (Ed. Code, § 35160.1; cf. also *id.*, § 14000 ["The system of public school support should be designed to strengthen and encourage local responsibility for control of public education"]; *California Teachers Assn.* v. *Hayes, supra,* 5 Cal.App.4th 1513, 1523-1524.)

The Legislature has explicitly recognized that "because of economic, geographic, physical, political, educational, and social diversity, specific choices about instructional materials need to be made at the local level" (Ed. Code, § 60002), that it has given school district governing boards "broad powers to establish courses of study, and that school district governing boards must have the ability to choose instructional materials which are appropriate to their courses of study" (*id.* ·§ 60003).

There is a correlative limitation upon the authority of courts to control the actions of local school districts. (Cf. *Johnson* v. *Board of Education* (1986) 179 Cal.App.3d 593, 600-601 [224 Cal.Rptr. 885].) "The United States Supreme Court has long recognized that school boards have broad discretion in the management of school affairs. [Citation.] By and large, public education is committed to the control of state and local authorities. 'Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate

basic constitutional values.' [Citation.] '[P]ublic schools are vitally important "in the preparation of individuals for participation as citizens," and as vehicles for "inculcating fundamental values necessary to the maintenance of a democratic political system." ' [Citation.] Therefore, 'local school boards must be permitted "to establish and apply their curriculum in such a way as to transmit community values, . . ." ' [Citation.] 'As a result, it is generally permissible and appropriate for local boards to make educational decisions based upon their personal social, political and moral views.' [Citation.]" (*McCarthy* v. *Fletcher* (1989) 207 Cal.App.3d 130, 139 [254 Cal.Rptr. 714]; cf. also *Board of Education* v. *Pico* (1982) 457 U.S. 853, 866 [73 L.Ed.2d 435, 446, 102 S.Ct. 2799].)

It follows that courts should give substantial deference to the decisions of local school districts and boards within the scope of their broad discretion, and should intervene only in clear cases of abuse of discretion.

### 2. *Incidental Noneducational Matters*

█ Under the Constitution and statutes, every activity of a California public school must be focused upon valid educational purposes achieved by suitable means. Nevertheless it has long been recognized that activities or procedures other than those which can be characterized as purely and universally educational may be deemed suitable to further the purposes of education (cf. *Veterans' Welfare Board* v. *Riley* (1922) 189 Cal. 159, 164-166 [208 P. 678, 22 A.L.R. 1531] [special educational opportunities for veterans]; *University of So. California* v. *Robbins* (1934) 1 Cal.App.2d 523, 528 [37 P.2d 163] [landscaping on grounds of private university]; see also *California Teachers Assn.* v. *Hayes, supra,* 5 Cal.App.4th 1513, 1528 [Child Care and Development Services Act]) and thus, implicitly, to be "not in conflict with the . . . purposes for which school districts are established" within the meaning of the constitutional provisions.

By direct extension of these principles, it must be deemed permissible for a public school district to expose its students to matters not comprehended within a strictly defined orthodox educational curriculum so long as the exposure is not proscribed by constitutional doctrine or explicit rule of law and so long as the exposure may be said to be *incidental* to use of educational materials reasonably necessary to a valid educational purpose, in that its practical impact on the educational process is relatively slight and may be viewed as simply a subordinate consequence of use of the materials, or other action taken, to serve the educational purpose. Examples range from matters as mundane as commercially provided food services (cf. *California School Emp. Assn.* v. *Sequoia etc. School Dist.* (1969) 272 Cal.App.2d 98, 112 [77

Cal.Rptr. 187]) to the various kinds of commercial activities and solicitations, quite apart from "Channel One," to which students have long been exposed at Overfelt and many other public schools.

The parties have directed our attention to what they have characterized as a " 'necessary and incidental' standard" attributed to *Board of Trustees* v. *County of Santa Clara* (1978) 86 Cal.App.3d 79 [150 Cal.Rptr. 109], and have debated at some length whether *Board of Trustees* does or does not bear directly on the issues before us. In our view *Board of Trustees* is of no more than limited assistance in this case, because it does not deal with the precise issues before us: It addresses not the question whether particular material to which public school students may be exposed is "not in conflict with or inconsistent with, or preempted by, any law, and . . . not in conflict with the purposes for which school districts are established" (Ed. Code, § 35160), but rather the meaning of the phrase "land . . . used exclusively for educational purposes" in the California provisions for exemption from property taxation (Cal. Const., art. XIII, § 3, subd. (e)) as applied to a private university. The question in *Board of Trustees* was whether Stanford University was entitled to an exemption from property taxes for its 166-acre golf course, notwithstanding that more than half of the use of the golf course had been made by members of the Stanford Golf Club and their guests, most of whom were Stanford alumni but not otherwise affiliated with Stanford University. The Court of Appeal's conclusion that the golf course had been used "exclusively for educational purposes" in the requisite sense was necessarily structured by considerations particularly pertinent to colleges and universities and to exemption from property taxation. Among other things, the Court of Appeal's references to academic freedom in the context of higher education, and its observation that the uses of the golf course were not undertaken as a means of generating revenue, cannot be deemed dispositive in the distinguishable factual and theoretical context of this case.

But we need not rely on *Board of Trustees* to conclude that, as an abstract proposition, a California public school district may lawfully expose its students to matters, not otherwise expressly proscribed, which may reasonably be characterized as incidental to a valid educational purpose.

Under the principles of *local control* to which we have referred, the essentially factual question whether particular noncurricular matters are or are not incidental must be addressed in the first instance to the broad discretion of local school districts and boards, and a court would be justified in disturbing the local decision only upon a clear showing of abuse of the local district's or board's sound discretion.

### 3. *Commercial Speech*

Whittle began its briefing to this court with the striking assertion that "[t]his is a case about State censorship and suppression of First Amendment protected speech." Whittle argued that neither Whittle nor the school district could constitutionally be limited, by the Superintendent of Public Instruction or the other plaintiffs or by a state court acting at their behest, in its right to communicate both editorial and commercial messages to public school students. The school district has added an argument that "[t]here simply is no constitutional right not to listen to commercial speech, and [the plaintiffs'] arguments, in effect, would instead permit censorship of speech."

The arguments are oversimplifications: Neither Whittle nor the school district had an absolute right of constitutional dimension to display classroom video advertising, because the advertising, as commercial speech, was entitled only to qualified protection.

It has been recognized that as a broad general proposition commercial speech is entitled to First and Fourteenth Amendment *protection (Va. Pharmacy Bd.* v. *Va. Consumer Council* (1976) 425 U.S. 748, 761-770 [48 L.Ed.2d 346, 358-363, 96 S.Ct. 1817]; cf. *Central Hudson Gas & Elec.* v. *Public Serv. Comm'n* (1980) 447 U.S. 557, 561 [65 L.Ed.2d 341, 347-348, 100 S.Ct. 2343]; *Near* v. *Minnesota* (1931) 283 U.S. 697, 707 [75 L.Ed. 1357, 1362-1363, 51 S.Ct. 625] [Fourteenth Amendment protects freedoms of speech, press]), in furtherance of "society's interest . . . in assuring the free flow of commercial information" (*Ohralik* v. *Ohio State Bar Assn.* (1978) 436 U.S. 447, 454 [56 L.Ed.2d 444, 452, 98 S.Ct. 1912]; cf. *Central Hudson Gas & Elec.* v. *Public Serv. Comm'n, supra,* 447 U.S. at pp. 561-562 [65 L.Ed.2d at pp. 347-348]; *Va. Pharmacy Bd.* v. *Va. Consumer Council, supra,* 425 U.S. at pp. 763-765 [48 L.Ed.2d at pp. 359-361]), but that the protection is by no means absolute (cf. generally *Va. Pharmacy Bd.* v. *Va. Council, supra,* 425 U.S. at pp. 770-773 [48 L.Ed.2d at p. 365]): The United States Supreme Court has "recognized 'the "common-sense" distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech.' [Citations.] The Constitution therefore accords a lesser protection to commercial speech than to other constitutionally guaranteed expression. [Citation.] The protection available for particular commercial expression turns on the nature both of the expression and of the governmental interests served by its regulation." (*Central Hudson Gas & Elec.* v. *Public Serv. Comm'n, supra,* 447 U.S. at pp. 562-563 [65 L.Ed.2d at pp. 348-349]; cf. also *Cincinnati* v. *Discovery Network* (1993) 507 U.S. __, __ [123 L.Ed.2d 99, 110-115, 113 S.Ct. 1505]; *Board of Trustees, State Univ. of N.Y.* v. *Fox* (1989) 492 U.S. 469, 473-481 [106 L.Ed.2d 388, 398-405, 109 S.Ct. 3028].)

██ Citing *Riley* v. *National Federation of Blind* (1988) 487 U.S. 781 [101 L.Ed.2d 669, 108 S.Ct. 2667], Whittle suggests that the commercial speech portions of "Channel One" are "inextricably intertwined" with its current events content and therefore "we cannot parcel out the speech, applying one test to one phrase and another test to another phrase," but must instead "apply our test for fully protected expression." (487 U.S. at p. 796 [101 L.Ed.2d at p. 689].) But the United States Supreme Court has more recently made clear that *Riley*, which involved professional fundraising for charitable organizations, was a special case: In *Board of Trustees, State Univ. of N. Y.* v. *Fox, supra*, 492 U.S. at page 474 [106 L.Ed.2d at pp. 399-400], it said of *Riley* that "[t]here . . . , the commercial speech . . . was 'inextricably intertwined' because the state law *required* it to be included." *Fox* dealt with a state university's attempt, by resolution, to bar "Tupperware parties" from the campus. (*Id.* at p. 473 [106 L.Ed.2d at p. 399].) Students who conducted Tupperware parties both sought to sell housewares and "touch[ed] on other subjects . . . , such as how to be financially responsible and how to run an efficient home." (*Id.* at p. 474 [106 L.Ed.2d at p. 399].) Rejecting an argument, under *Riley*, that the commercial and noncommercial speech aspects of Tupperware parties are inextricably intertwined, the United States Supreme Court said that "[n]o law of man or of nature makes it impossible to sell housewares without teaching home economics, or to teach home economics without selling housewares. Nothing in the [state university's] resolution prevents the speaker from conveying, or the audience from hearing, these noncommercial messages, and nothing in the nature of things requires them to be combined with commercial messages." (*Ibid.*; cf. also *Association of Nat. Advertisers, Inc.* v. *Lungren* (N.D.Cal. 1992) 809 F.Supp. 747, 752-753.)

Similarly, here, neither Whittle's decision to package current events programming (to which the plaintiffs do not appear to object) with commercial advertising (to which they do), nor the school district's decision to accept the package, was ultimately compelled by any "law of man or nature": but for economic considerations, either message might have been conveyed without the other. Thus Whittle's classroom video advertising can properly be analyzed, for constitutional purposes, as commercial speech.

In any event we need not reach the constitutional free speech issue because use of "Channel One" in the classroom may be validated on other grounds.

### The Issues

Upon the issues directly presented by this appeal, we shall conclude that the trial court correctly rejected the plaintiffs' contentions that classroom

video advertising can never be deemed incidental to valid education purpose, and therefore that school district contracts for such advertising are illegal as a matter of law. We shall also conclude that the trial court correctly determined that the "Channel One" advertising, even though not shown to be more than incidental in this case, could lawfully be used in classrooms only so long as students were not coerced to view it. We shall further conclude, however, that the circumstances of record did not support the court's order for injunctive relief to compel adoption of a specified opt-out procedure.

### 1. *Could "Channel One's" Advertising Ever Be Incidental?*

The plaintiffs have conceded that the current events programming (as distinct from the classroom video advertising) of "Channel One" may be found to have legitimate educational value. The school district's implicit determination that "Channel One's" current events programming served a valid educational purpose is supported by the record and was well within the sound discretion of the school district.

On the other hand, Whittle has conceded that "[n]o one contends that the ["Channel One"] advertising is educational." Viewed, in isolation, as a commercial marketing vehicle, classroom video advertising has nothing whatsoever to do with the broad educational goal specified by the California Constitution. Neither Whittle nor anyone else suggests that the school district could properly have given Whittle carte blanche to display classroom video advertising without limitation as to content or duration. Whittle concedes that the district " 'cannot enter the advertising business.' "

As thus framed by the parties, the primary issue before us is whether the concededly noncurricular "Channel One" advertising could be deemed *incidental* to the valid educational purpose of the current events programming.

Addressing this issue on a factual level, the trial court determined that the classroom video advertising would be illegal "if the material . . . has such great quantitative or qualitative impact upon the educational process that it cannot reasonably be considered to be incidental." We agree with the trial court's premises as we understand them: That particular classroom video advertising might be found to be either so inconsistent with, or otherwise disruptive of, orthodox curriculum in terms of content, or so disproportionately invasive of instructional time in terms of length, as to require a judicial conclusion that the classroom video advertising could not be deemed incidental, and that to permit the classroom video advertising in such circumstances would be an abuse of the school district's broad discretion notwithstanding the existence of a valid educational purpose.

Whittle and the school district argued to the trial court that when the two minutes of classroom video advertising, limited and subject to faculty veto as to content, were evaluated in light of the students' known right to opt out and were compared to the 10 minutes of current events programming and to the substantially more than 240 minutes of instruction provided by the school district each school day, the classroom video advertising should be deemed incidental to the valid educational purpose to be served by the current events programming.

The trial court found, in essence, that "Channel One's" classroom video advertising had not been shown to be more than incidental to a valid educational purpose. We would quibble with the trial court's findings only insofar as they might be read to imply that the trial court could and did try the factual question—whether the advertising was in fact more than incidental—de novo: As we have pointed out, the determination whether the advertising was incidental was to be entrusted in the first instance to the broad discretion of the local school district, and the trial court's only concern, on this issue, would have been whether the district's determination constituted a clear abuse of the district's discretion. For this purpose the trial court would, of course, have been required to assess whether the factual record provided some measure of support for the district's determination (cf. *Shapell Industries, Inc.* v. *Governing Board* (1991) 1 Cal.App.4th 218, 232 [1 Cal.Rptr.2d 818]), but the trial court would not have been authorized to decide for itself whether the advertising was more than incidental to a valid educational purpose.

 Reading the trial court's finding as a conclusion that the district had *not* abused its discretion, on the record before us we would agree with the trial court. We should point out, however, that our concurrence does not and cannot extend beyond the precise circumstances of record in this case: In another case, a showing of more intrusive commercial content, or of less effective editorial content, might warrant a conclusion that it would be an abuse of discretion for a school district to enter into such a contract. Nor should we be understood to suggest that it would have been a clear abuse of discretion for this (or another) school district to have *declined* to enter into the Whittle contract, either because it concluded that the classroom video advertising was not incidental or because it found that the editorial content of "Channel One" did not serve a valid educational purpose: We must emphasize once again that a local school district's discretion to make such determinations is broad and must be judicially respected as such.

The plaintiffs do not ask us to assess the school district's factual determinations. On appeal, as in the trial court, the plaintiffs attack neither the

abstract concept that public school students may be exposed to noncurricular matter incidental to a valid educational purpose, nor the sufficiency of the factual record to support a conclusion that, in implicitly finding as a factual matter that the classroom video advertising was incidental, the school district did not abuse its discretion. Instead, the plaintiffs argue that, as a matter of law, a school district may *never* lawfully contract for, or display, classroom video advertising such as "Channel One's." The thrust of this argument is that because use of classroom video advertising is unlawful *as a matter of law*, the factual question whether such advertising could be deemed incidental should not be reached and the school district's discretion would not be invoked. The plaintiffs assert that the incidental-noncurricular-matter concept does not and cannot apply to a contract for "commercial advertising during instructional time"; rejecting the suggestion that a maximum of two minutes of advertising may be deemed de minimis, they appear to adhere to their position that, as stated in the trial court, even "one second" of classroom video advertising would be impermissible. The plaintiffs assert that "[i]t is the advertising scheme itself that is the problem, not the educational resources purchased with the revenue from the advertising." Amicus curiae California Teachers Association adds that "[i]t is the use of designated classroom time for private commercial purposes that is offensive and this offense is not cured by making it voluntary with the student." The plaintiffs ask, essentially rhetorically, "whether the 19th century framers" of article IX, section 1, of the California Constitution "could have possibly considered commercial advertisements to be a 'suitable means' of providing for the schools."

Twentieth century enactments have considerably clarified the meaning of "the 19th century framers'" phrase: In light of the clear language of the California Constitution (as amended effective in 1973) and of Education Code sections 35160 and 35160.1, the essence of the plaintiffs' argument must be taken to be that in *every* case classroom video advertising such as "Channel One's" would be so clearly inconsistent with or preempted by one or more *laws*, or so clearly in conflict with the *purposes* for which school districts are established, that in no case could display of such advertising be deemed incidental to a valid educational purpose.

The trial court summarily rejected the plaintiffs' argument. ■ The argument presents a pure question of law which we are empowered to consider independently (*Sobeck & Associates, Inc.* v. *B & R Investments No. 24* (1989) 215 Cal.App.3d 861, 866 [264 Cal.Rptr. 156]), unbound by the conclusion the trial court reached.

The plaintiffs concede, as they must, that "[t]here is no California constitutional provision, statute, or regulation that expressly addresses" the legality

of classroom video advertising. The plaintiffs, and amicus curiae, do invoke various constitutional doctrines and Education Code provisions, but, as we shall make clear, none of them is directly applicable to this situation. Alternatively the plaintiffs rely on arguments

(a) By analogy from otherwise unrelated constitutional doctrines;

(b) By analogy from assertedly relevant statutes and administrative policy statements; and

(c) That classroom video advertising is fatally inconsistent with "our core values regarding 'public education.'"

We find none of these arguments persuasive. Each appears ultimately to return to a single theme: That entrepreneurs should not be permitted to enter the public school classroom in pursuit of profits and that public school districts should not be permitted to abet the entrepreneurs' attempts to do so. We shall conclude that the plaintiffs place excessive stress on the profit motive of entrepreneurs and on the perceived (but unpersuasively documented) commercialism of school districts that deal with the entrepreneurs, and pay insufficient attention to the dispositive question of impact upon the public school student and the educational process. The dispositive question must, in our view, be answered case by case, and in any but the clearest case it must be answered—as it was in this case—by local school officials rather than by a court.

We shall agree with the trial court that contracts for classroom video advertising are not illegal as a matter of law.

a. *Constitutional Doctrines*

■ The plaintiffs first propose that "[t]elevision advertising should be treated like religion for constitutional purposes." Their argument appears to be that just as the establishment clause of the First Amendment, and comparable provisions of the California Constitution (Cal. Const., art. I, § 4), have been held to prohibit public schools from conveying religious messages to their students (cf., e.g., *Sands* v. *Morongo Unified School Dist.* (1991) 53 Cal.3d 863, 870-883 [281 Cal.Rptr. 34, 809 P.2d 809], citing many of the United States Supreme Court cases), so we should conclude that public schools may not convey commercial messages to their students through the medium of "Channel One."

On its face this argument is all but vitiated by the perception that constitutional provisions for religious freedom, ultimately based in philosophical concerns fundamental to the formation of our nation, simply have

nothing to do with whether school districts may lawfully be party to attempts to use video programming to market commercial products to their students.

In fairness, the plaintiffs neither directly suggest an analogy between religious messages and video commercials nor directly assert that the establishment clauses would apply to classroom video advertising. They appear, instead, to rely on rhetoric from these and other cases to support an hypothesis that public school students are in essence a captive audience and are also particularly susceptible to being influenced by a perception that the public school itself endorses the products sought to be marketed through classroom video advertising.

But, thus analyzed, this is not a constitutional argument at all: Rather the plaintiffs simply propose a variant of their basic assertion that as a matter of public policy classroom video advertising can never be considered a suitable means by which to provide any part of a public school education.

Nor does the plaintiffs' argument add appreciable weight to the basic assertion.

That the audience may be deemed in some sense captive, and in some degree suggestible, would not as a general proposition render unsuitable as a matter of law a message not otherwise proscribed. The question is whether classroom video advertising is otherwise proscribed. An argument based in constitutional provisions for freedom of religion does not reach this question.

The plaintiffs tendered no evidence to support their assertion that students, susceptible or not, would be likely to perceive that Overfelt itself endorses a particular soft drink or deodorant. The plaintiffs suggest that their own collective expertise as Superintendent of Public Instruction, California Congress of Parents and Teachers, and individual high school teachers should be deemed sufficient to support a presumption that their assertion is reasonable, but the suggestion is not a satisfactory substitute for evidence.

■ Next the plaintiffs propose that "[t]elevision advertising should be treated the same as partisan political campaigning."

In this instance the plaintiffs argue from the premise that an agency of the state, supported by public funds, cannot be permitted to advocate partisan political positions as to particular issues or electoral candidates. (Cf. *Stanson* v. *Mott* (1976) 17 Cal.3d 206, 217 [130 Cal.Rptr. 697, 551 P.2d 1]; *Miller* v. *Miller* (1978) 87 Cal.App.3d 762, 768-770 [151 Cal.Rptr. 197]; see also

*League of Women Voters* v. *Countywide Crim. Justice Coordination Com.* (1988) 203 Cal.App.3d 529, 546 [250 Cal.Rptr. 161].)

Assuming the validity of the plaintiffs' broadly stated premise, once again the plaintiffs do not directly relate the premise to the question before us. Their argument appears to be that there is a broader principle—that publicly provided resources or opportunities may not be used to advocate a course of action (whether it be endorsement of a particular partisan candidate or initiative or purchase and use of a particular brand of soft drink) which not all members of the underwriting public might otherwise choose, and that the partisan-political-activity cases are simply paradigmatic applications of the broader principle which (the plaintiffs assert) should also be applied to school district contracts for classroom video advertising.

The plaintiffs' broader principle is too broad to be persuasive, or even useful, in this case. The principle could as readily be applied to any element of orthodox school curriculum as to which a difference of opinion could be anticipated; relatively few of the elements of the most orthodox of curricula would survive.

In sum the plaintiffs' constitutional arguments do not support the plaintiffs' position.

b. *Statutes and Policy Statements*

The plaintiffs, and amicus curiae California Teachers Association, list a number of California statutes, and two policy statements of the State Board of Education, from which, they argue, a policy against advertising in the public schools may be inferred.

The plaintiffs argue that "a number of related education statutes" indicate a "legislative intent to separate public education from private commerce," and suggest that these statutes are evidence of authoritative legislative construction of the California Constitution's reference to "suitable means" of public education.

The plaintiffs first assert that general proscriptions against misuse of public school property dictate a conclusion that the school district cannot legally "turn Overfelt . . . into a telemarketing center" or "enter the advertising business . . . ." The plaintiffs cite three statutes:

*Education Code section 40041* provides for use of school facilities or grounds as a "civic center" for community activities, including discussion by

a wide variety of civic groups of "any subjects and questions which in their judgment pertain to the educational, political, economic, artistic, and moral interests of the citizens of the communities in which they reside." (Ed. Code, § 40041, subd. (a).) The section goes on to enumerate divers purposes for which school facilities may properly be used and adds a catchall category for "[o]ther purposes deemed appropriate by the governing board" of the school district. (*Id.*, subd. (b)(7).)

*Education Code section 40042, subdivision (3)* vests management and control of school facilities in school district governing boards but requires the governing boards to promulgate rules to provide, among other things, "[t]hat the use of school facilities or grounds is not inconsistent with the use of the school facilities or grounds for school purposes or interferes with the regular conduct of schoolwork."

*Education Code section 35272* permits the governing board of a school district to "acquire and pay for educational and athletic equipment, supplies and materials, and other personal property necessary to its operation of the schools, as provided by law." The plaintiffs rely on an opinion of the Attorney General that school districts may *sell* school supplies only in limited circumstances: "School districts are not in the business of providing school supplies to private persons or organizations. . . . [S]chool districts may not engage in unlimited sales of school supplies under [Education Code] section 35160, since such actions would be inconsistent with state law and also in conflict with the purposes for which school districts are established." (60 Ops.Cal.Atty.Gen. 184, 188 (1977).)

The plaintiffs argue that statutes require that students be instructed in "principles of . . . truth," and that "all instructional materials shall be 'accurate, objective, and . . . suited to the needs of pupils" and must "encourage thrift," but that, at odds with these statutory admonitions, "Channel One's" advertisements "exag[g]erate and glorify consumption by pandering to adolescent desires for popularity, status, glitter, and sexual attractiveness. The school that shows 'Channel One' appears to endorse those images, which may itself be a false message. Advertising cannot . . . reasonably be considered to be 'truthful, accurate, or objective' in presenting the merits of a product. Advertising for junk food and expensive shoes cannot reasonably be considered to 'meet the needs of the pupils.' Advertising certainly does not promote 'thrift' among California's youth." To support this argument the plaintiffs cite three statutes:

*Education Code section 44806* provides that "[e]ach teacher shall endeavor to impress upon the minds of the pupils the principles of morality,

truth, justice, patriotism, and a true comprehension of the rights, duties, and dignity of American citizenship, including kindness toward domestic pets and the humane treatment of living creatures, to teach them to avoid idleness, profanity, and falsehood, and to instruct them in manners and morals and the principles of a free government."

*Education Code section 60045* (also cited by amicus curiae) provides that "[a]ll instructional materials adopted by any governing board for use in the schools shall be, to the satisfaction of the governing board, accurate, objective, and current and suited to the needs and comprehension of pupils at their respective grade levels."

*Education Code section 60042* provides that "[w]hen adopting instructional materials for use in the schools, governing boards shall require such materials as they deem necessary and proper to encourage thrift, fire prevention and the humane treatment of animals and people."

The plaintiffs also quote from a compilation, in the record on appeal, of policy statements of the State Board of Education regarding selection of instructional materials.

"To prevent unfair exposure for any privately produced product," in 1977 the State Board adopted a position that "[i]nstructional materials shall not contain illustrations of any identifiable commercial brand names, products, or corporate or company logos unless such illustrations are necessary to the educational purpose of the instructional material and that purpose cannot be achieved without using such illustrations, or unless such illustrations are incidental to a scene of a general nature . . . . [¶] . . . These exceptions aside, if a brand name, representation, or company logo is illustrated, prominence shall not be given to any one brand or company unless, in turn, such illustration is necessary to the educational purpose of the instructional material and that purpose cannot be achieved without using such illustration . . . ." Arguably this policy statement has been superseded to the extent the State Board's October 1990 resolution regarding "USE OF COMMERCIAL TELEVISION ADVERTISING IN THE CLASSROOM," to which we have referred, is inconsistent with the earlier statement.

"To accustom students to seeing and dealing with representations of nutritious foods and to foster a positive attitude toward exercise," in 1986 the State Board suggested "emphasizing, when appropriate, foo[ds of] high nutritive value and regular exercise," but added that the suggestion did not "constitute an absolute prohibition against [por]trayal of foods of low nutritive value and the ab[sence] of exercise, but rather deal with the applicatio[n of] emphasis."

The plaintiffs argue, broadly, that "[t]he advertising scheme embodied by 'Channel One' is inconsistent with each of these statutory purposes and State Board policies."

We disagree. The plaintiffs and amicus curiae cannot be said to have established that existing statutes and administrative declarations render contracts to display television commercials in their classrooms *unlawful in all circumstances.*

Education Code sections 40041 and 40042, and the Attorney General's opinion concerning Education Code section 35272, fall far short of establishing that the Legislature has forbidden all classroom video advertising. Speculation as to what these sections indicate the Legislature *might* have to say about classroom video advertising is, of course, idle until such time as the Legislature chooses to speak. It appears that bills to forbid classroom video advertising, presumably supported by the Superintendent of Public Instruction, have in fact been submitted to the Legislature, which has not passed them. (Cf., e.g., Sen. Bill No. 741 (1991-1992 Reg. Sess.); Assem. Bill No. 2009 (1991-1992 Reg. Sess.); Sen. Bill No. 1047 (1993-1994 Reg. Sess.).)

The various statutes the plaintiffs cite that bear on instruction methods and the content of instructional materials are unpersuasive primarily because of the willingness of both the school district and Whittle to concede that the classroom video advertising embedded in "Channel One" is not itself instructional but should be rationalized solely and simply as an incidental concomitant of materials which *are* instructional and the educational value of which has not been seriously challenged.

The State Board's policy statements add very little to the plaintiffs' argument: One appears to have been superseded in relevant respects and the other makes clear that it is directed not so much against portrayal of nonnutritious foods as in favor of exercise.

The plaintiffs cite two additional statutes.

*Education Code section 60061, subdivision (e)* requires that every publisher or manufacturer of instructional materials offered for adoption or sale in California "[n]ot in any way, directly or indirectly, become associated or connected with any combination in restraint of trade in instructional materials, or enter into any understanding, agreement, or combination to control prices or restrict competition in the sale of instructional materials for use in this state." Apparently conceding that "Channel One" and comparable

programming may be considered "instructional materials," the plaintiffs argue that Whittle's contractual provisions against unpermitted use of "any other news program specifically designed for viewing by teenagers in schools and which contains advertising" must be deemed to "restrict competition." Section 60061's patent purpose is to discourage activity which would reduce the availability of *instructional materials*. Whittle's contract clause is manifestly intended to clear the classroom video advertising field for Whittle's advertisers insofar as the *classroom video advertising* is associated with exactly this kind of instructional programming. There is no restriction on either instructional materials—Cable News Network (CNN), for one, provides current events programming for school districts—or advertising—various kinds of commercial marketing, other than classroom video advertising, has long been tolerated in the school district—as such. Whittle's restriction on a particular kind of *advertising* in combination with current events programming would not appear to come within section 60061.

■ *Education Code section 51520* provides, with exceptions not relevant to the issues before us, that during (and within short periods before and after) school hours "pupils of the public school shall not be solicited on school premises by teachers or others to subscribe or contribute to the funds of, to become members of, or to work for, any organization not directly under the control of the school authorities . . . ." The plaintiffs do not elaborate upon the perceived relevance of this statute; amicus curiae argues that "[t]he daily commercial solicitations in the classroom in Channel One are prohibited by the language of this section. [¶] . . . It is undisputed that Whittle . . . and the commercial enterprises advertising on Channel One are not under the control of school authorities," and thus that use of "Channel One" in the classroom violates section 51520. Section 51520 proscribes solicitation in behalf of organizations "not directly under the control of the school authorities . . . ." Whittle and the school district argue that, by virtue of the monitoring and veto powers in their contract, Overfelt and its teachers do in fact exercise control over "Channel One's" classroom video advertising. In our view a clearer answer is provided by the perception that section 51520 is in fact directed at, and intended to control, the activities of organizations which seek *donations* of money or time, and that the section does not in terms reach commercial advertising. Certainly this perception is consistent with the longstanding toleration, in this and other school districts, for many other forms of commercial advertising on public school campuses.

We are satisfied that the various statutes and State Board policy statements the plaintiffs cite by no means establish as a matter of law that classroom video advertising will be illegal in all circumstances.

### c. *"Core Values"*

Finally, the plaintiffs assert that "[w]hile this case presents novel and difficult issues, it must ultimately be resolved by reliance upon our core values regarding 'public education.'"

#### (1) *Commercial Advertising*

The crux of the plaintiffs' core values argument appears to be their perception that the motives and methods of commercial advertising are simply and irreconcilably antithetical to the ideals of public education.

The plaintiffs acknowledge that "[i]n our view, the case rises or falls on the characterization of the transaction itself" and that "[w]e believe, as matter more of principle than of absolute fact, that selling the minds of public school students to commercial advertisers is simply inappropriate and an invitation to compromise the integrity of the entire public school system." In the plaintiffs' view, "we are dealing with a commercial advertising scheme that uses student attendance and attention as saleable property. That scheme cannot reasonably be characterized as educational. It does not matter that the television equipment and nonadvertising portion of 'Channel One' serve educational purposes. It is the advertising scheme itself that is the problem, not the educational resources purchased with the revenue from the advertising. [¶] . . . In our view, [the school district] has entered into a three-way advertising partnership with Whittle and its commercial advertisers. Each party is selling something and receiving something valuable in return: [the school district] sells the students' attention; Whittle sells advertising opportunities; and [the advertiser] sells candy bars. If 'Channel One' is a legitimate way for school districts to raise money, then eventually the entire public school system will be one big market opportunity with the children available to the highest bidder."

Amicus curiae suggests that "[p]resumably all parties would agree that had the District contracted with the Mars Candy Company to show students daily ads for Mars candy bars, this would be in conflict with the purposes for which the District was established, whether or not the District used the income from the advertising campaign to purchase curricular materials or classroom technology. The only question here, then, is whether this result can be escaped when, rather than being paid with money which is then used to buy curriculum or technology, the District is paid directly with curriculum and technology."

The plaintiffs generalize, broadly, that "[t]he children are inherently vulnerable; they deserve our extraordinary protection from indoctrination in

all of its forms," and that they "are grossly offended by the very idea of television advertising as a regular part of a child's school day," but they identify no specific harm to students, or to their educational experience, to be anticipated from commercial advertising in the classroom. Nor do the plaintiffs appear to address the specific facts of this case, and in particular, the strict limits as to content and length applicable to "Channel One" advertising. Nor is the argument supported by citation to the record or to any source of legal precedent of which this court may take cognizance. The gist of the argument, from factual premises the plaintiffs perhaps assume would be subject to judicial notice (cf. Evid. Code, § 459), is that sellers of goods and services cannot be allowed to use video to market their wares in the classroom, and that school districts cannot become parties to the sellers' attempts to do so. The argument appears to focus on the financial motives of the sellers and of the school districts with which the sellers might contract, and primarily to express the plaintiffs' aversion to such motives.

The misdirection of the plaintiffs' argument is illustrated by the plaintiffs' assertion that "[i]f the ads were 'incidental,' Whittle could not sell them at a rate that would support the investment." The argument misses the point that, to meet what we perceive to be the applicable standard, the noncurricular material need only be incidental in relation to a *valid educational purpose.* That Whittle stands to make a great deal of money from "Channel One" has nothing whatsoever to do with whether, from the educational standpoint of the school district and its students, the "Channel One" advertisements were incidental to a valid educational purpose.

The record before us contains no evidence to suggest that the school district was motivated by anything other than a wish to obtain "Channel One," other Whittle video programming, and video equipment for educational purposes. Whittle, on the other hand, has already conceded and could hardly deny that its motivation is (as the plaintiffs assert) to make a profit by selling advertising opportunities. But in our view Whittle's concession (if relevant at all to the question whether classroom video advertising must inevitably be "in conflict with the purposes for which school districts are established") supports a negative rather than an affirmative answer to the question: To sell advertising opportunities, Whittle must be able to persuade advertisers that it can deliver the market. To deliver the market, by obtaining school district contracts for "Channel One," Whittle must produce a current events program of educational quality sufficient to attract the interest of teachers and at the same time to pass muster with school boards and educational administrators under California's educational standards. If the current events product is not well done and attractive it will not be accepted; if it does not serve valid educational purposes it cannot be used in the

classroom; in either event advertisers will not buy Whittle's advertising time and Whittle will not realize the profit it seeks.

The plaintiffs' argument also glosses over the public education system's longstanding tolerance for many other forms of commercial encroachment on the public schools.

The record reflects, and the plaintiffs do not deny, that student exposure to many forms of advertising, often directly associated with overt commercial ventures, has long been tolerated, if not encouraged, within the school district: Vending machines containing a wide variety of brand-marked snacks, commercial logos on computer equipment and sports scoreboards, printed advertisements in library periodicals and in assigned reading materials from magazines or newspapers as well as in school yearbooks, direct promotion of school-authorized class photographers, brand-name identification of food service products, sale of school rings and jackets, commercial announcements on the public address system, and even commercials in programs students are assigned to watch on commercial television channels.

The plaintiffs undertake to distinguish these forms of commercialism (which they characterize as "less intrusive") from "the invasive and pervasive nature of the televised program known as 'Channel One'" which, in the plaintiffs' view, "clearly crosses the line of appropriateness and changes 'school' from an educational to a commercial experience." Amicus curiae argues that none of these other commercial advertisements "involve classroom *time* that is taken up by the video showing of commercial advertisements. These other commercial advertising presences . . . can appropriately be deemed passive presences, i.e., ones that need not take any of a student's time." Amicus curiae adds that "[t]he issue in this case is not whether any commercial advertising in the school is appropriate. The issue is whether the use of designated classroom time to show video commercial advertisements constitutes an abuse of school district discretion." The plaintiffs' position on this point is clear: "[A]s a matter of law, advertising as powerful as that found in 'Channel One' *should be prohibited per se.*"

The record in the case before us would not appear to warrant these arguments. The absolutism of the positions taken by the plaintiffs—"one second" of classroom video advertising would be too much—and amicus curiae—"[t]here is simply no way to draw a line between one minute a day of commercials, five minutes a day of commercials, and an hour a day of commercials"—strongly suggests that both the plaintiffs and amicus curiae are troubled not so much by this case as by where this case might lead. Both in their briefs and at oral argument the plaintiffs have essentially acknowledged their concern that this case might be simply the entry point for

unlimited commercial advertising in the classroom. As they put it in their reply brief: "Given the shortage of funds for public education, it is easy to reach for Whittle's 'quick fix.' The implications of television advertising, however, present a dire future for public education. If 'Channel 1' is legal, then all manner of commercial, profit-making schemes will gradually seep into the school day. If two minutes per day of advertising is harmless, why not ten minutes or twenty? What if entire class periods are devoted to commercial indoctrination and the sponsors offer to give out free soda and candy to students who attend? How much of the school day—that is supposed to be dedicated to learning—can be diverted into an active advertising campaign before the public education system ceases to be either public or educational? This is a case for line-drawing."

We are more optimistic of the abilities of school districts, administrators, and teachers, and (in an extreme case) of trial courts, to draw any lines that need be drawn on a case-by-case basis. Neither the plaintiffs nor amicus curiae have given us a judicially cognizable basis for a declaration that classroom video advertising can never be deemed incidental to a valid educational purpose, or that on any other basis such advertising must invariably be declared unlawful.

### (2) *Separation of Powers*

 In any event an abstract appeal to "core values" of public education is not within our purview.

"The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution." (Cal. Const., art. III, § 3.)

"[C]ourts are not school boards or legislatures . . . ." (*Wisconsin* v. *Yoder* (1972) 406 U.S. 205, 235 [32 L.Ed.2d 15, 36-37, 92 S.Ct. 1526].) Abstract assessment of "core values" is beyond the scope of our judicial function. Our own perceptions of "core values regarding 'public education'" would be essentially irrelevant: As judges we can be neither makers of educational policy nor arbiters of the philosophical propriety of educational policies developed, in accordance with our system of government, by the Legislature and by state and local school officials. The plaintiffs must address their argument to local school districts, to the Legislature, and ultimately to the people, in whom the power to develop public educational policy properly resides. We are by no means insensitive to the will of the people, to which counsel for the Superintendent of Public Instruction referred at oral argument. But our system of government requires, probably in part as a

safeguard against possible misunderstanding, that a court of law receive the will of the people not by way of presentations made by articulate advocates for particular causes but rather by way of the coequal legislative and executive branches, in the form of statutes or administrative regulations having the force of law. A court cannot be, as the plaintiffs repeatedly urge us to be, a substitute Legislature.

### 2. *Must Student Viewing Be Voluntary?*

The trial court also made clear that in its view student exposure to "Channel One" should be "strictly voluntary." It would have found particular classroom video advertising illegal "if students are coerced directly or indirectly into viewing commercial material . . . ." The trial court found no evidence of *direct* coercion but concluded that the plaintiffs had "raised a legitimate concern about the possibility of indirect coercion" upon teachers to use, and students to watch, "Channel One." On this basis the trial court ultimately required that the school district, as a condition to continued use of "Channel One," take specified steps to assure that students were aware of their options not to use, or not to watch, "Channel One," and that the school district require "a regular, structured, supervised alternative to 'Channel One' " for students who wished to opt out.

In support of its own appeal in this court, Whittle argues that students *can* be compelled to watch classroom video advertising.

The crux of Whittle's argument is that if (as Whittle has consistently asserted) the trial court was correct in its determination that the commercial advertising in "Channel One" was necessary and incidental to a legitimate educational purpose, then *by virtue of that determination* any arguable coercion upon students to watch the commercial advertising must be deemed incidental as well. Whittle argues that "[s]chools *require* students to do things"—implicitly, things more integral to orthodox public education than video commercials—"all the time . . . ," and that compulsory noneducational activities are not illegal if incidental to a valid educational purpose.

Whittle's argument is superficially attractive. If the impact of "Channel One's" commercial solicitation upon the educational process is in fact so slight as to warrant a finding that it is incidental, then at least as a practical matter the significance of a requirement that students submit to the solicitation might be similarly discounted. This is not, after all, a case of asserted state-sponsored religious (cf., e.g., *Abington School Dist.* v. *Schempp* (1963) 374 U.S. 203, 226 [10 L.Ed.2d 844, 860-861, 83 S.Ct. 1560]) or ideological (cf., e.g., *Board of Education* v. *Barnette* (1943) 319 U.S. 624, 637, 642 [87

L.Ed. 1628, 1637,1639-1640, 63 S.Ct. 1178, 147 A.L.R. 674]) indoctrination but simply another manifestation of a commercial ethic to which all of us have been increasingly exposed, but which, despite its proliferation, has not yet been authoritatively characterized as indoctrination in any constitutionally significant sense.

But amicus curiae California Teachers Association suggests a plausible reason, of constitutional provenance if not of constitutional dimension, why students cannot be compelled to listen to commercial speech in the public school classroom *during mandatory instructional time.* As we perceive it, the argument is that mandatory school attendance laws such as California's (Ed. Code, § 48200 et seq.) effectively confine students during the school day, that students share with all other citizens a constitutional right not to be confined without compelling reason (cf., e.g., *Parham* v. *J.R.* (1979) 442 U.S. 584, 600 [61 L.Ed.2d 101, 117, 99 S.Ct. 2493] [commitment of children to mental hospital]), and that although mandatory attendance laws have been constitutionally validated for orthodox educational purposes "where nothing more than the general interest of the parent in the nurture and education of his children is involved" (*Wisconsin* v. *Yoder, supra,* 406 U.S. 205, 233 [32 L.Ed.2d 15, 35]; cf. also *Meyer* v. *Nebraska* (1923) 262 U.S. 390, 402 [67 L.Ed. 1042, 1046, 43 S.Ct. 625, 29 A.L.R. 1446]; *Pierce* v. *Society of Sisters* (1925) 268 U.S. 510, 534 [69 L.Ed. 1070, 1077-1078, 45 S.Ct. 571, 39 A.L.R. 468]), the power to decree universal compulsory education "is by no means absolute . . . ." (*Wisconsin* v. *Yoder, supra,* 406 U.S. at p. 215 [32 L.Ed.2d at p. 25].) Amicus curiae argues that "[t]he justification for depriving the liberty of juveniles by compelling their attendance at school simply does not apply" to classroom video advertising. "In [such a] situation, the fundamental educational purpose that justifies compelled school attendance is missing. The constitutional violation inherent in compelling student attendance to view commercial advertisements can be overcome only if the viewing is purely voluntary."

Having previously acknowledged that the "Channel One" commercials cannot be deemed educational, Whittle relies, in response to amicus curiae, entirely on its argument that the commercials have been found to be, and in fact are, incidental.

We agree with the trial court, on the basis of amicus curiae's argument, that public school students *cannot* be *compelled* to watch classroom video advertising. The fact that the concededly noneducational classroom video advertising is incidental to a valid educational purpose or purposes does not alter the fact that the advertising is noneducational. Whittle's proffered examples of assertedly noneducational activities which *can* be required of

students do not support its position: "Passing time" between classes can properly be regarded as integral to the educational process; certainly students can be required to move, in accordance with a reasonable timetable, from one class to the next. Recesses, even if not dedicated to other education-related activities such as passing between classes and opportunities for meals, may reasonably be regarded as periods of respite essential to effective classroom performance by both students and teachers. Printed advertisements adjacent to assigned reading materials in commercial magazines and newspapers presumably have no educational value in and of themselves, but students are not compelled to read the advertisements. The essence of amicus curiae's plausible argument is that students should no more be compelled to watch classroom video advertising than they are compelled to read printed advertisements adjacent to assigned reading materials. And because the commercial video advertising is seamlessly integrated into "Channel One's" current events programming, we perceive no practical way to permit students to opt out of only the classroom video advertising: to assure that student viewing of the advertisements is voluntary, the students must be allowed to opt out of "Channel One" altogether.

Patently the conclusion we reach offends neither Whittle's asserted constitutional right to transmit commercial speech to students nor the students' constitutional right (asserted by Whittle in their behalf) to receive it (cf. *Va. Pharmacy Bd.* v. *Va. Consumer Council, supra,* 425 U.S. at pp. 756-757 [48 L.Ed.2d at pp. 334-355]): Whittle remains free to transmit, and the students to receive, as much commercial speech (within the constraints of Whittle's contract with the school district) as the students are freely willing to hear. Nor can Whittle assert that our conclusion would frustrate its reasonable expectations under its contract with the school district: Whittle's own contract form permits the school district to "accommodate" students who wish to opt out.

### 3. *Did the Record Support Injunctive Relief?*

Alternatively Whittle argues that even if students could not lawfully be compelled to watch the classroom video advertising, the record in this case does not support a finding of actual or threatened compulsion sufficient to justify the injunctive relief the trial court ordered.

In an appropriate case, the opt-out procedures the trial court decreed in this case would arguably be permissible and desirable. The procedures rationally address the underlying concern that students be provided with constructive alternatives to "Channel One," and that they be made aware of their right to opt out, provide a workable mechanism by which to exercise

that right, and assure that (as a means of recognizing parental interest and of controlling potential misuse) the power to exercise the opt-out right be subject to parental control.

But upon the record before us we are obliged to agree with Whittle that the injunctive portion of the judgment cannot be affirmed, because the record does not support an essential finding that the students *would* be compelled to watch the classroom video advertising. Absent such a finding, the trial court lacked authority to burden the school district with court-devised procedures to avert a speculative possibility that students otherwise *might* be so compelled.

The plaintiffs sought, and the trial court ultimately gave, essentially equitable relief embodied primarily in a permanent injunction.

 It has been said that a court called upon to afford relief historically or analytically equitable in its nature "has broad powers to fashion a remedy. [Citation.] It may create new remedies to deal with novel factual situations. [Citation.] Further, the court is not strictly limited to the particular relief requested in the prayer of the complaint. [Citation.]" (*Oceanside Community Assn.* v. *Oceanside Land Co.* (1983) 147 Cal.App.3d 166, 177 [195 Cal.Rptr. 14].)

But it is clear that the power to give equitable relief is not unlimited. Years ago the United States Supreme Court pointed out that "[i]t is always the duty of a court of equity to strike a proper balance between the needs of the plaintiff and the consequences of giving the desired relief. Especially where governmental action is involved, courts should not intervene unless the need for equitable relief is clear, not remote or speculative." (*Eccles* v. *Peoples Bank* (1948) 333 U.S. 426, 431 [92 L.Ed. 784, 789, 68 S.Ct. 641]; cf. *Henschen* v. *City of Houston, Tex.* (5th Cir. 1992) 959 F.2d 584, 588.) Similarly, California adheres to the rule, particularized to injunctive relief, that "[i]njunction 'is an extraordinary power, and is to be exercised always with great caution' and the power rarely, if ever, should be exercised in a doubtful case. [Citations.] If, therefore, at the time of the order or judgment, in the absence of special circumstances . . . , there is no reasonable probability that past acts complained of will recur, injunctive relief will be denied. Injunctive power is not used as punishment for past acts and is ordered against them only if there is evidence they will probably recur. [Citations.] A court of equity will not afford an injunction to prevent in the future that which in good faith has been discontinued in the absence of any evidence that the acts are likely to be repeated in the future. [Citations.]" (*Mallon* v. *City of Long Beach* (1958) 164 Cal.App.2d 178, 190 [330 P.2d

423]; cf. *Feminist Women's Health Center* v. *Blythe* (1993) 17 Cal.App.4th 1543, 1555 [22 Cal.Rptr.2d 184]; *Phipps* v. *Saddleback Valley Unified School Dist.* (1988) 204 Cal.App.3d 1110, 1117 [251 Cal.Rptr. 720]; *Engle* v. *City of Oroville* (1965) 238 Cal.App.2d 266, 270 [47 Cal.Rptr. 630].)

■ Although a decision whether to issue, and how to phrase, a permanent injunction is essentially discretionary (cf., e.g., *Feminist Women's Health Center* v. *Blythe, supra*, 17 Cal.App.4th at pp. 1554-1555), the trial court's discretion is by no means as broad as that which it might exercise in weighing the equities of the parties' positions for the purpose of deciding whether to issue a *preliminary* injunction or other provisional relief. "A permanent injunction is very different from a pendente lite injunction. . . . A permanent injunction is a determination on the merits that a plaintiff has prevailed on a cause of action . . . against a defendant and that equitable relief is appropriate. A permanent injunction is not issued to maintain the status quo but is a final judgment on the merits. [Citation.]" (*Art Movers, Inc.* v. *NI West, Inc.* (1992) 3 Cal.App.4th 640, 646 [4 Cal.Rptr.2d 689].) Like any judgment, a permanent injunction, notwithstanding its discretionary component, must be sufficiently supported by the evidence of record. (*Ibid.*; cf. also *Richards* v. *Dower* (1883) 64 Cal. 62, 64 [28 P. 113].) If the evidence is insufficient to justify issuance of a permanent injunction, the trial court simply had no discretion to exercise. The Supreme Court has gone so far as to state that "[w]hether a permanent injunction should issue becomes a question of law where the ultimate facts are undisputed and in such a case the appellate court may determine the issue without regard to the conclusion of the trial court. [Citations.]" (*Eastern Columbia, Inc.* v. *Waldman* (1947) 30 Cal.2d 268, 273 [181 P.2d 865].)

■ In this case the pertinent factual record was essentially undisputed. It showed that:

(1) Whittle's own form of agreement for use of "Channel One" explicitly provides that school districts may develop opt-out procedures.

(2) Consistent with this provision, Whittle and the school district reached oral agreement at the outset that (among other things) "the District would not require students to watch Channel One but would instead make this an optional student activity."

(3) In 1990, "[w]hen the District first presented Channel One to parents of Overfelt students, the parents were advised both by letter and at the 'Back-To-School' meeting that students could opt out of viewing Channel One with parental permission. [¶] . . . Since that time, in order to ensure that parents

understand that student viewing of Channel One is optional, the District has developed the policy and practice of advising parents that such viewing is optional, and that if any parent objects to Channel One, accommodations will be made to permit the student to study in the career center or quad area during third period when Channel One is being shown." By August 1992, according to the district superintendent, students could "opt out of the Channel One broadcast entirely at parental request. If they do choose to remain in the classroom, students are not limited to the alternative of reading quietly or doing homework while Channel One is aired. They have wide discretion in what they do, including talking, reading, writing, and doing homework. Students may also be excused from the classroom to attend school meetings."

(4) In September 1992, after the trial court issued its memorandum of decision, the Overfelt principal "sent all Overfelt parents/legal guardians a letter . . . , at the start of the school year, discussing various school matters, including Channel One. The letter advised parents that the Court had upheld the voluntary viewing of Channel One . . . and had instructed the district to give written notice to parents, legal guardians and students that the viewing of Channel One is optional. Further, the letter explains that students who opt out of Channel One will report to room F-9 for a study hall. Spanish and Vietnamese translations were included with the letter; thus, the letter was provided in the primary language of the homes of approximately 98 percent of Overfelt's students." The school district did not send the formal opt-out notice or the opt-out form the trial court had indicated it would require, pending "the Court's final order and clarification of required procedures . . . ."

In short the record reflects that at all relevant times the school district has had, and has made known to the parents of every student, a policy to permit students, with parental approval, to opt out of "Channel One," and that in any instance in which the trial court announced a preference for procedures at variance with those specified by the school district, the district adapted its procedures to what it perceived the court's preference to be as soon as the district received notice of the court's position. There is no showing whatsoever to the contrary, and no indication that the school district had proceeded in anything other than good faith with respect to the issue of voluntariness. Nor was there any showing whatsoever that the school district's own opt-out procedures, or the means by which the district publicized them, were less than effective to permit students to make informed and in all other respects voluntary decisions whether or not to opt out. We consider it significant that the school district's opt-out procedures are quite similar to those specified (and a fortiori approved) by the Legislature for opting out of instruction in

health, family life education, sex education, and venereal disease education. (Ed. Code, §§ 51240, 51550, 51820.)

On this state of the record we perceive no factual basis for the trial court's findings that (although no actual coercion had been demonstrated) "[p]lain-. tiffs have . . . raised a legitimate concern about the possibility of indirect coercion. . . . While the evidence shows that both students and their parents are advised that viewing of 'Channel One' is voluntary, there is considerable doubt as to whether the alternatives to viewing offered to the students are reasonably equal in terms of the physical resources and supervision incident to them. One reasonably may ask whether it is realistic to expect a student to choose the inconvenience of opting out of 'Channel One' over the familiar passive role of sitting and watching television. These factors in combination raise a real and substantial question as to whether indirect coercion of teachers and students with respect to the use of 'Channel One' exists."

With all respect to the careful and thoughtful analysis the trial court gave to the difficult issues before it, we cannot agree *either* that "a real and substantial question as to whether indirect coercion . . . exists" would be sufficient to warrant judicial intervention in the school district's opt-out procedure *or* that the evidence is sufficient, in any event, to raise so much as a "real and substantial question" as to coercion. The record reflects that students and their parents were given several alternatives to "Channel One," varying from simply not paying attention to opting out by leaving the classroom to attend school meetings or a study hall in a preassigned room. The burden would have been upon the plaintiffs to show that these alternatives were unsatisfactory; if (as the trial court implies) the evidence left it in doubt on the issue, the doubt should have been resolved against the plaintiffs. The inconvenience of opting out to which the trial court refers appears to us a modest condition upon, and in no significant sense an obstacle to, a student's right to choose. The plaintiffs suggest, on the basis of language from establishment clause cases, that "[t]he choice not to participate in the 'normal' school activity is inherently stigmatizing and makes dissenting students feel 'excluded and unwelcome' at their own school." The suggestion is unpersuasive: The evidence of record simply does not support a conclusion that a reasonable student would have been dissuaded by the prospect of stigma from a decision to opt out of viewing a 12-minute videotape on current events. The opt-out procedures adopted by the school district were closely similar to those approved by the Legislature with respect to the measurably more controversial subject of sex education.

"Special circumstances" may, in particular cases, relax the requirement that a court base its injunctive order on circumstances known as of the

time of the order or judgment (cf. *Mallon* v. *City of Long Beach, supra,* 164 Cal.App.2d at pp. 188, 190); examples would include issues relevant to acquired immune deficiency syndrome (*Phipps* v. *Saddleback Valley Unified. School Dist., supra,* 204 Cal.App.3d at p. 1119) and, arguably, circumstances which clearly implicate constitutional issues of separation of church and state or freedom from ideological indoctrination. ▮▮▮ We find no comparable special circumstances here; absent plainly applicable legal doctrine we reiterate our view that value judgments as to use of television commercials in the classroom must be made by the people through their Legislature or their school officials, and that courts must limit themselves to review of the legality of the actions legislators and school officials take.

That the trial court's opt-out procedures might have been more thorough, and might ultimately have been more effective, than those the school district voluntarily constructed is essentially irrelevant in this case. We conclude that the record afforded the trial court no basis on which to intervene by way of injunctive relief.

### 4. *Could the Court Retain Jurisdiction to Appoint a Monitor?*

The trial court reserved jurisdiction "to appoint a qualified individual to monitor . . . compliance" with its judgment. ▮▮▮ Whittle argues that the powers proposed to be vested in a monitor under the trial court's reservation of jurisdiction were too broad.

We note preliminarily that the trial court clearly could retain general jurisdiction to assure compliance with its judgment. The relief for which the plaintiffs prayed was essentially equitable, and the judgment as we shall modify it will be, in essence, a declaration of rights which is a form of equitable relief. (Cf. *Culbertson* v. *Cizek* (1964) 225 Cal.App.2d 451, 462 [37 Cal.Rptr. 548]; *Mills* v. *Mills* (1956) 147 Cal.App.2d 107, 116 [305 P.2d 61].) ▮▮▮ " 'The jurisdiction of a court of equity to enforce its decrees is coextensive with its jurisdiction to determine the rights of the parties, and it has power to enforce its decrees as a necessary incident to its jurisdiction. Except where the decree is self-executing, jurisdiction of the cause continues for this purpose, or leave may be expressly reserved to reinstate the cause for the purpose of enforcing the decree, or to make such further orders as may be necessary.' " (*Day* v. *Sharp* (1975) 50 Cal.App.3d 904, 912 [123 Cal.Rptr. 918], quoting from *Klinker* v. *Klinker* (1955) 132 Cal.App.2d 687, 694 [283 P.2d 83]; cf. also, e.g., *Rynsburger* v. *Dairymen's Fertilizer Coop., Inc.* (1968) 266 Cal.App.2d 269, 278-279 [76 Cal.Rptr. 102]; *Mills* v. *Mills, supra,* 147 Cal.App.2d at p. 116.) It follows that retention of jurisdiction by the court for the purpose of interpreting and enforcing its judgment is within

the scope of declaratory relief. (Cf. *Bertero* v. *National General Corp.* (1967) 254 Cal.App.2d 126, 136-137 [62 Cal.Rptr. 714]; *City of L.A.* v. *City of Glendale* (1943) 23 Cal.2d 68, 81 [142 P.2d 289]; cf. also *Mills* v. *Mills, supra,* 147 Cal.App.2d at p. 116.) And as we have noted, in this as in other aspects of its equitable jurisdiction, the trial court, as what would historically have been an equity court, would have had broad powers to fashion "new remedies to deal with novel factual situations. [Citation.]" *(Oceanside Community Assn.* v. *Oceanside Land Co., supra,* 147 Cal.App.3d at p. 177; cf. *Roman* v. *Ries* (1968) 259 Cal.App.2d 65, 70 [66 Cal.Rptr. 120].)

Whittle does not dispute these principles. It has acknowledged, both in its brief and at oral argument, that as an abstract proposition the trial court might properly appoint a compliance monitor. But Whittle suggests, apparently on the basis of inference from remarks the trial court made at hearings, that what the trial court proposed was to ask such a monitor not only to assure compliance with the judgment but also to gather evidence in areas already fully litigated before the court.

We would agree with Whittle that an appointment for this second purpose would be inappropriate in any event: Although the trial court might have reopened the evidence before entry of judgment, once judgment was entered it would be empowered to reopen the evidence on which the judgment was based only by means of procedures tantamount to an order for a new trial. In the exercise of its retained jurisdiction the trial court could (among other things) properly consider new evidence directly pertinent to the ongoing rights of the parties, including but not limited to "new social scientific evidence," so long as the evidence is in fact *new* in the sense that it was not available at the time of trial, either because the events to which it relates had not yet occurred, or (in the case of "new social scientific evidence") the relevant data had not yet been collected, or the relevant expertise had not yet been developed. But the trial court could not properly use the mechanism of a monitor or referee to readdress facts previously litigated.

 But we disagree with Whittle's reading of the judgment which, as we perceive it, contemplates possible future use of a monitor only for the purpose of observing and reporting events *after* the judgment so that the court might be advised, in the exercise of its retained jurisdiction, of any need which might arise *in the future* to interpret or to enforce the terms of the judgment. A monitor might properly be appointed for such a purpose.

Thus the trial court's retention of jurisdiction to appoint a monitor was unobjectionable in and of itself. We should emphasize, however, that the record before us reflects no need to appoint such a monitor at this point, and

that the trial court should not exercise its retained power unless and until such a need is demonstrated. A compliance monitor's activities will inevitably be in some measure intrusive upon the function he or she is directed to monitor; it is for this reason that such an intrusion must in each case be justified by a sufficient showing of need. We anticipate that any perceived failure to comply with the trial court's declaration of rights in this case can and will be promptly reported to the court by parents, students, or teachers.

*Disposition*

Upon the essentially uncontradicted record before us we are satisfied that we may effect judicial economy by directly modifying the trial court's judgment in accordance with the views we have stated (cf. *Eastern Columbia, Inc.* v. *Waldman, supra,* 30 Cal.2d at p. 273), and by affirming the judgment as so modified.

The paragraph beginning at page 2, line 10, of the judgment entered on January 4, 1993, in Santa Clara County Superior Court action No. 717380, Bill Honig, etc., et al., v. East Side Union High School District et al., is modified to read as follows:

"IT IS ADJUDGED

"1. That the contract between East Side Union High School District and Whittle Communications L.P., a Delaware limited partnership, for use by the school district of certain television programming including the current affairs program known as 'Channel One,' is not illegal as a matter of law;

"2. That the parties to the contract may lawfully perform the terms of the contract so long as

"a. The commercial advertising embedded in the video programming known as 'Channel One' is, and remains, incidental to a valid educational purpose, and

"b. No student is compelled to view 'Channel One,' and no student's standing with his or her classroom teachers, school administration or school district is affected adversely by a decision by the student not to view 'Channel One';

"3. That plaintiffs Bill Honig, Superintendent of Public Instruction, and others, have not borne their burden of proving that any of the acts of either party (or those in privity with them) in execution of the contract is illegal as

a matter of fact or demonstrates a reasonable probability of future illegality or of future infringement upon the rights of any person; and therefore that there is no basis for injunctive relief at this time;

"4. That the court shall retain jurisdiction to interpret and enforce its judgment (by means which may if appropriate include appointment of a qualified individual to monitor the parties' compliance with the terms of this judgment) as and to the extent hereafter shown, after notice to all affected parties, to be necessary; and

"5. That each party shall bear his, her, or its own fees and costs."

As so modified the judgment is affirmed. Each party shall bear his, her, or its own costs on appeal.

Cottle, P. J., and Elia, J., concurred.